303 A.2d 769.

STATE *vs.* STEVEN ANDREW DOUKALES.

MAY 3, 1973.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

445

PAOLINO, J. On February 27, 1968, the defendant was arrested by state police officers in a small corner variety store which he operated in the city of Newport. He was charged with violating (1) G. L. 1956 (1969 Reenactment) §11-19-18[1] (Keeping of gambling places or devices), (2) §11-19-14 (Bookmaking), and (3) §11-19-5 (Acts in aid of policy game — unlawful possession of lottery slips). All three charges arose out of the same set of facts and circumstances. The first was an indictable offense and the others misdemeanors. He was subsequently indicted for the alleged violation of §11-19-18.

The three charges were heard before a justice of the Superior Court and a jury.[2] At the termination of the state's case, defendant moved for a directed verdict on all three charges. The trial justice granted the motion on the charge of violating §11-19-14, but denied it as to the other two charges and the trial then continued with defendant taking the stand in his own defense. The jury returned a verdict of guilty in both cases. After the trial justice denied his motions for a new trial, defendant prosecuted a bill of exceptions to this court.

The pertinent facts are briefly as follows. As the result of information received from an alleged reliable informer

[1]For convenience we have attached G.L. 1956 (1969 Reenactment) §11-19-18 as Appendix A and §11-19-5 as Appendix B.

*See Note 1* in *State* v. *Hindle,* 108 R.I. 389, 275 A.2d 915 (1971).

[2]The misdemeanors were before the Superior Court on appeal from the District Court of the First Judicial District.

two state police officers, Troopers Anthony J. Mancuso and Thomas C. Griffin, went to defendant's small corner variety store at approximately 12:55 p.m. on February 27, 1968. They had no search warrant. Upon their entry they saw defendant standing behind the counter of the store putting yellow slips of paper into a brown bag on top of the counter. They did not know what was on the slips. There was a man in the store drinking a soda. The state does not claim that he was gambling in defendant's store. The defendant took the brown paper bag and threw it to the left of him behind the counter. As Trooper Mancuso started to go around the counter to get the brown bag, Trooper Griffin saw a yellow slip of paper on the counter in front of defendant and said: "There's a horse bet—a yellow slip of paper!" Trooper Mancuso testified that he placed defendant under arrest after he examined the slip of paper with the horse bet on it and then he seized the paper bag. He stated that he did not know whether the slip of paper was defendant's or not.

I

The defendant's first assignment of error is that the trial justice erred in denying his motion for a directed verdict on the charge of violating §11-19-18. We agree. *State* v. *Hindle,* 108 R. I. 389, 275 A.2d 915 (1971) is controlling here.

The fact that the premises in the case at bar involves a place of business open to the public is, in and of itself, of no legal significance in determining whether there has been a violation of §11-19-18. Nor does it matter that a customer, admittedly not involved in gambling activities, was present when the police entered defendant's store.

Our holding in *State* v. *Hindle, supra,* is clear. That case involved the search of a home and garage. In *Hindle* we said:

" * * * that the 'building, room, booth, shed' referred to in §11-19-18, contemplates a place designed for people to assemble for the purpose of gambling therein." *Id.* at 393, 275 A.2d at 917.

We reaffirm this in *State* v. *Kaufman,* 108 R. I. 728, 729, 279 A.2d 412, (1971), in the following language:

"The thrust of Hindle was that the Legislature intended in enacting §11-19-18 to make criminal the maintaining of a building or place designed to be used by persons assembled therein for the purpose of gambling."

The facts in the case at bar do not bring this case within the contemplation of §11-19-18. There is no evidence that the store was designed for people to assemble for the purpose of gambling therein and neither is there any evidence "* * * of any other person gambling or offering to gamble on the premises." *Hindle, supra* at 390, 275 A.2d at 916. Clearly, under no view of the evidence, giving full credibility to the state's evidence, viewing it in the light most favorable to the state, and drawing every inference consistent with guilt, could a jury find that defendant's use of his premises constituted a violation of §11-19-18. It was, therefore, error to deny defendant's motion for a directed verdict on the charge of violating §11-19-18. *State* v. *Saulnier,* 109 R. I. 11, 15-16, 280 A.2d 85, 88 (1971). Exception 1 is sustained and the conviction on the charge of violating §11-19-18 is reversed.

## II

Under exception 2 defendant contends that his conviction for possession of lottery slips in violation of §11-19-5 should be reversed. As we understand his argument, he claims there was no probable cause to arrest him and, therefore, the seizure of the brown bag after his arrest and its introduction into evidence were unlawful. We do not agree.

On the view we take we need not consider whether the information received by the state troopers from the alleged reliable informer was sufficient to meet the test set forth in *State* v. *Roach,* 106 R. I. 280, 259 A.2d 119 (1969), to establish probable cause for an arrest without a warrant. The defendant's premises consisted of a business establishment open to the public. Regardless of the motive which prompted the troopers to go to defendant's variety store, their entry was not unlawful. *Compare State* v. *Ouimette,* 108 R. I. 283, 274 A.2d 732 (1971) and *Ouimette* v. *Howard,* 339 F.Supp. 1166 (D. R. I. 1972). The only question is whether, after their lawful entry, their arrest of defendant and the seizure of the brown bag after such arrest were lawful or not.

This raises the question of whether there was probable cause for defendant's arrest after their otherwise lawful entry. The answer to this question depends in turn upon whether defendant's arrest was in violation of §12-7-3 and the fourth and fourteenth amendments to the Constitution of the United States. The pertinent portion of §12-7-3 provides that a peace officer may arrest a person for a misdemeanor without a warrant whenever "[t]he officer has reasonable ground to believe that a misdemeanor has been or is being committed in his presence and that the person to be arrested has committed or is committing it." As we pointed out in *State* v. *Roach, supra,* and *State* v. *McWeeney,* 100 R. I. 394, 216 A.2d 357 (1966), the term "probable cause" as it is used in the fourth amendment and the term "reasonable ground" as it appears in our statute mean substantially the same thing.

There is competent evidence here showing that after the troopers entered the store, Trooper Griffin saw a yellow slip of paper near the brown paper bag on the counter in front of where defendant was standing, that he called Trooper Mancuso's attention to this slip on which a daily-

double bet was recorded, and that after Trooper Mancuso examined the slip of paper he placed defendant under arrest and then seized the brown paper bag. It is true, as defendant points out, that in dismissing the §11-19-14 bookmaking charge against defendant and discussing the evidence relative to the bookmaking charge the trial justice said, in part, that

> "There has been no writing or comparison or anything done to link this recording of a wager with the defendant and * * * his possession of the slip could not be described as anything more than constructive possession."

However, the fact that the trial justice found that the state had failed to establish by the required quantum of proof any link between defendant and the yellow slip, insofar as the bookmaking charge was concerned, does not mean that it was not sufficient to constitute probable cause for defendant's arrest and to support a conviction for a violation of §11-19-5.

We agree with defendant's argument that the legality of the arrest is to be determined by the existence of probable cause at the time of the arrest and not by what the subsequent search may disclose. As we said in *State* v. *Roach, supra* at 283, 259 A.2d at 122, the analysis required for an answer to the question whether there is probable cause for an arrest without a warrant is basically similar to that demanded of a magistrate when he considers whether a search warrant should issue. A magistrate may find probable cause on evidence less than is required to convict or even on evidence which may be incompetent in a criminal trial. *State* v. *LeBlanc,* 100 R. I. 523, 217 A.2d 471 (1966).

As the court said in *Spinelli* v. *United States,* 393 U. S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637, 645 (1969), "* * * only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause * * *."

The finding of the yellow slip with a recorded bet thereon, the presence of the brown paper bag, and the information[3] received from the alleged reliable informer that defendant "carried the action and the money in a brown paper bag," taken together, constituted probable cause for defendant's arrest without a warrant. This is so even though not one of those factors, standing alone, might constitute a reasonable ground for the police officer to believe that a misdemeanor had been or was being committed in his presence and that defendant had committed or was committing such violation.

We find no violation of any of defendant's rights under our statute or under the fourth or fourteenth amendments of our Federal Constitution. In the circumstances the seizure of the brown bag immediately after defendant's arrest was lawful. On this record we cannot say that the trial justice erred in denying defendant's motion for a directed verdict on the charge of possession of lottery slips in violation of §11-19-5 and, therefore, his exception to such ruling is without merit.

For the reasons stated the defendant's exception 1 to the denial of his motion for a directed verdict on the charge that he violated §11-19-18 is sustained and his conviction for violating that statute is reversed. Exception 2 to the

---

[3]Trooper Mancuso testified that he received the following information from the informer:

"He told me that he had been betting the numbers with Steven Doukales at Steve's Variety Store on Bridge Street in the City of Newport. He told me he had been betting with Mr. Doukales for quite some time, but he waited to give me the information to cut down on his chances of being suspected. He told me that Mr. Doukales had receipts for the action that he took numbers. He also told me he left his place of business every day at approximately one o'clock, and he carried the action and the money in a brown paper bag. He told me he was doing a big business and if I went over there shortly before one o'clock, I would catch him with his brown bag with the action."

denial of his motion for a directed verdict on the charge of violating §11-19-5 is overruled and his conviction of such charge is affirmed. His remaining exception, having been neither briefed nor argued in compliance with Rule 16 of the rules of this court is deemed to be waived. *State* v. *Lisi,* 105 R. I. 516, 253 A.2d 239 (1969).

The case is remitted to the Superior Court for Newport County for further proceedings in accordance with this opinion.

## APPENDIX A

11-19-18. Keeping of gambling places or devices — Acting as dealer, banker, or lookout.—Every person who shall keep or suffer to be kept any building, room, booth, shed, tent, arbor, or any other place, or any automobile, bus, coach, van, truck, trainer, railway or railroad car, or any other vehicle in any city or town of this state, or in any vessel, boat or raft upon any of the waters of Narragansett bay, to be used or occupied for the purpose of gambling, or playing at any game or games of chance of any kind whatsoever, for money or other valuable consideration, or shall keep, exhibit, or suffer to be kept or exhibited upon his premises or in his vehicle or under his control, any cards, dice, table, bowls, wheel of fortune, shuffleboard, or billiard table, or any device, implement or apparatus whatsoever to be used in gambling or playing at any game or games of chance for money or other valuable consideration, or who shall be guilty of dealing faro, or banking for others to deal faro, or acting as lookout, gamekeeper or assistant for the game of faro or any other banking game where money or property is dependent on the result, shall be taken and held to be a common gambler and shall be imprisoned not exceeding two (2) years or be fined not exceeding five thousand dollars ($5,000), nor less than five hundred dollars ($500).

## APPENDIX B

11-19-5. Acts in aid of policy game.—Whoever keeps, sets up, promotes, or is concerned as owner, agent, clerk, or in any other manner, in managing any policy-lottery or policy-shop, or writes, prints, sells, transfers, or delivers any

ticket, certificate, slip, bill, token, or other device purporting or designed to guarantee or assure to any person, or to entitle any person to a chance of drawing or obtaining any prize or thing of value to be drawn in any lottery, or in the game or device commonly known as policy-lottery, or policy; or for himself or another person writes, prints, sells, or transfers or delivers, or has in his possession for the purpose of sale, transfer, or delivery, or in any way aids in selling, exchanging, negotiating, transferring, or delivering, a chance or ticket in any lottery, or in the game or device commonly known as policy-lottery or policy, or any such bill, slip, certificate, token, or other device, or who sells or offers to sell what are commonly called lottery-policies, or who indorses a book or other document, for the purpose of enabling others to sell or offer to sell lottery-policies, or shall receive, register, record, forward, or purport or pretend to forward, or undertake to forward, or receive, and agree to forward, to or for a lottery, or to or for any particular lottery, or to any person, within or without this state, any money, thing, or consideration of value, to purchase an interest or share in any lottery, or to obtain or secure for any person what is commonly called a lottery-policy, or a chance of drawing or obtaining any prize or thing of value to be drawn in any lottery, or in the game or device commonly called policy-lottery, or policy, or who shall receive or offer to receive any money, thing, or consideration of value to be forwarded to or for a lottery, or to or for any particular lottery, or to any person to invest in a lottery, within or without this state, whether the same actually exists or not, or whether any drawing of the same, or any act to allot any prize or thing of value, takes place or not, or whether there be any such person or not, or whoever shall have in his possession, knowingly, any bill, slip, certificate, token, or other device, or article of any kind such as is used in carrying on, promoting, or playing the game commonly known as policy-lottery or policy, shall, upon conviction, be punished by fine not exceeding five hundred dollars ($500) or imprisonment not exceeding one (1) year, and upon a second conviction of a violation of this section shall be imprisoned for a period not less than one (1) nor more than five (5) years.

*Richard J. Israel,* Attorney General, *Donald P. Ryan,* Asst. Attorney General, *Edward E. Dillon, Jr.,* Special Asst. Attorney General, for plaintiff.

*Ralph D. Morrison,* for defendant.