STATE

v.

**Thomas FIRTH.**

No. 77–373–C.A.

Supreme Court of Rhode Island.

Aug. 4, 1980.

Dennis J. Roberts II, Atty. Gen., Faith A. LaSalle, David H. Leach, Sp. Asst. Attys. Gen., for plaintiff.

John F. Cicilline, Providence, for defendant.

## OPINION

KELLEHER, Justice.

A Superior Court jury returned a guilty verdict after hearing evidence relating to a single-count indictment charging the defendant, Thomas Firth (Firth), with first-degree murder. Following this conviction, a trial justice imposed a life sentence. Although Firth is before us on a multifaceted appeal, we believe that the decisive issue concerns the events leading up to his initial arrest.

At approximately 11 p. m. on December 3, 1973, James Dunn was watching television in the living room of his girl friend's apartment at 178 Long Street in Warwick. As the evening's televised news began, suddenly there was a blast of gunfire, the smashing of a nearby window, and the splintering of a wooden shutter that covered the lower inner half of the window frame. When the gunfire had stopped, Dunn lay on the living-room floor bleeding profusely. His girl friend telephoned the rescue squad and then attempted to administer to Dunn's needs. Within a matter of minutes, members of the Warwick police department and its rescue squad arrived at the scene. Dunn told the attendants that he was dying and wished the services of a priest. He informed the police that he had seen the gunman, "Freddy Bishop," at the window after the first shot was fired.

About two hours later Bishop was arrested five miles away on Narragansett Parkway in a car driven by Firth. Firth and Bishop were taken to police headquarters. At 1:25 a. m., the police received word that Dunn had died. The cause of his death was a bullet that entered his lower back and severed his spinal cord, causing severe internal damage. Bishop was charged with Dunn's murder, but Firth, later that morning, was released from custody. While Firth was in custody, his clothes were taken and later forwarded to the FBI where they were examined for such items as glass fragments. A month later, on January 4, 1974,

Firth was arrested and charged with the murder of James Dunn.

In our opinion, the decisive issue in this appeal concerns the denial by a justice other than the trial justice of Firth's motion to suppress the evidence obtained by the FBI. A review of the correctness of this denial necessitates a brief recapitulation of the evidence adduced at the suppression hearing.

The star witness at the hearing was Lieutenant Frank A. Ricci (Ricci), who in December 1973 was a sergeant assigned to the second platoon of the police department's uniformed patrol section. This platoon worked the four-to-midnight shift. When Ricci arrived at the scene of the shooting, he ordered some of his subordinates to canvass the area to determine if any of the residents had seen or heard anything that might be of help in the investigation. The residents reported hearing "muffled voices," "loud explosions," a "car door closing," and "the sound of an engine leaving the area." When the sergeant heard that Dunn had identified "Freddy Bishop" as his assailant, the sergeant put out a broadcast to "pick up" a 1963 Rambler owned by Firth's wife and a late-model Lincoln bearing dealer's plates and being driven by John Ouimette. Ricci's pick-up order was based upon his knowledge as a policeman "that Bishop and Firth were together," "that Bishop had been seen as a passenger in the Firth vehicle," and "also that Bishop had been a passenger in Ouimette's vehicle." At the hearing Lieutenant Ricci testified that he knew that Bishop had "never been licensed to drive a vehicle." Ricci acknowledged that a third pick-up order concerning Bishop's girl friend and her Fiat had been issued that evening. He also conceded that at the time he issued the pick-up orders, he had "no evidence" that Firth had accompanied Bishop to the shooting. "It was," he said, "a conclusion drawn by me." When Ricci was asked if the conclusion was based upon "their prior association," he responded, "Yes, sir."

The final witness at the suppression hearing was David DeRosa, a retired officer who at the time of the issuance of Ricci's pick-up orders was captain of detectives. Captain DeRosa told the suppression justice that he released Firth because as of 11 a. m., on December 4, 1973, "I had no tangible evidence that would indicate that Mr. Firth knew that a felony had been committed, or that he had been with Mr. Bishop when the felony was committed."

The suppression justice first referred to "all of the information which form[ed] the basis for the broadcast and for the actual arrest * * *." He then alluded to the "multitude of decisions in this area of search and seizure" and a "growing trend" "through all the decisions that, in considering the rights of defendants in all of these matters, we cannot close our eyes to reality. We must use common sense. And we must have a concern for the protection of the public, to see to it that the average man and woman on the streets of this country may feel free and secure from the commission of a crime against their person or their property." This motion was then denied by the suppression justice, who found that there was probable cause for Firth's arrest.

■ The legality of an arrest is determined by the existence of probable cause at the time of the arrest, and not by what a subsequent search may disclose.[1] *State v. Doukales*, 111 R.I. 443, 303 A.2d 769 (1973). Probable cause exists when the facts and circumstances known by the officers and of which they have reasonably trustworthy information are sufficient to warrant a person of reasonable caution to believe that an offense is being or has been committed and that the defendant has committed it. The arresting officer in the field is entitled to rely on the departmental knowledge that comes to him through official channels. *State v. Smith*, R.I., 396 A.2d 110 (1979). Although a court determining the existence of probable cause must view the circum-

stances in the context of the factual and practical considerations of everyday life, probable cause to arrest one person does not in itself constitute probable cause to arrest and search everyone else present or associating with the first individual. *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 340, 62 L.Ed.2d 238, 245 (1979); *Sibron v. New York*, 392 U.S. 40, 62–63, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917, 934 (1968); *People v. Galloway*, 7 Ill.2d 527, 131 N.E.2d 474 (1956).

■ The ability to arrest someone must stand on something more than suspicion. *State v. Almeida*, 105 R.I. 687, 255 A.2d 151 (1969). Although good police work may be premised on good hunches, such hunches, standing alone, cannot establish probable cause to arrest. *United States v. Chadwick*, 532 F.2d 773 (1st Cir. 1976), *aff'd*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). We believe that the three pick-up orders issued by the Warwick police are concrete proof that the department was apparently operating on a hunch as it sought to wrap up the Dunn homicide. We share the suppression justice's concern that people can walk the streets in safety, but we are just as concerned that the police demonstrate probable cause for the warrantless arrest of people who might be walking or traveling on the public highways. Since the requisite probable cause was not present when Firth was arrested, we reverse.

The defendant's appeal is sustained, the judgment of conviction appealed from is vacated, and the case is remanded to the Superior Court.

---

[1]. A crucial prosecution witness was a special FBI agent who testified that upon examining Firth's clothing, he uncovered particles of glass. The agent told the jury that, based on comparison tests, there was a high degree of probability that the particles on Firth's clothing and the particles from the inner and outer windows of the duplex apartment emanated from the same source.