**In re JOHN C. and James C.**

**No. 80–203–Appeal.**

Supreme Court of Rhode Island.

Feb. 13, 1981.

Reargument Denied March 12, 1981.

Walter F. Richardson III, Asst. Town Sol., Warwick, for petitioner.

Murphy, Mullen & Jarret, James J. Mullen, Providence, William F. Reilly, Public Defender, Barbara Hurst, Janice M. Weisfeld, Paula Rosin, Asst. Public Defenders, for respondents.

## OPINION

KELLEHER, Justice.

At approximately 3 p. m. on Friday, November 16, 1979, Patrolman Thomas C. Cornicelli (Cornicelli) was on patrol in the Natick section of West Warwick when he received a radio message that a housebreak was "possibly in progress" at 77 Quaker Lane. Cornicelli was ordered to proceed to the Quaker Lane area. Further radio communications indicated that firearms were part of the loot.

While Cornicelli was leaving the Natick area, Detective Joseph M. Rossi (Rossi) was driving easterly along Route 117 to the West Warwick police headquarters in a patrol car that had been sent to the neighboring town of Coventry for repairs. Rossi, a police officer for over eleven years, was directed to proceed to the Route 2 area. As he was traveling south on Route 2, Rossi "observed two male subjects in the rear of the Alderic Building in a swampy area." At that moment the suspects were approximately "500 yards" away from the scene of the break. Rossi contacted the Quaker Lane patrol and told Cornicelli to "apprehend" the subjects.

Cornicelli did as he was told. He drove into the parking lot alongside the Alderic Building and "asked the boys" to leave the swamp and climb up an embankment to the parking lot. The boys complied with Cornicelli's request. After Cornicelli asked the boys what they were doing, he frisked them for weapons. He then placed the duo in the back seat of his car and shut the door. Cornicelli's cruiser had a cage that separated the back-seat area from the front-seat portion of the vehicle. The rear-door handles had been removed so that once the doors were shut, the boys no longer were

free to leave. The boys are the respondents, John C. and James C. John and James, who in November 1979 were fifteen and fourteen years of age, respectively, are not related to each other.

When Rossi arrived in the parking lot, he opened the cage. The boys were told to get out of Cornicelli's cruiser. Rossi performed a second frisk of both youths, and in the process he extracted from John's back pants pocket a silver dollar. The boys were then returned to the cruiser. Rossi took the coin, returned to 77 Quaker Lane, and asked the woman who had reported the break if she had any silver dollars. She indicated that she did have one such item, looked for it, but could not find it. When Rossi showed her the silver dollar taken from John, she identified it as hers.

The boys were transported to police headquarters where they were given their *Miranda* warnings. John chose to remain silent. However, when James was taken to the photography room for a mug shot, he began to cry and told the police he would show them "where the stuff was." James and two detectives returned to the Quaker Lane area and discovered the loot in a wooded area about 1,000 feet to the rear of 77 Quaker Lane. Photographs introduced at the hearing indicated that the loot included a shotgun, rifles, a camera, coins, and a stereo.

In due course, John and James came before the Family Court on petitions in which the court was asked to adjudge each of them as being delinquent for having broken into a dwelling in the daytime with intent to commit larceny therein. Their mutual defense is a familiar one: a motion to suppress the evidence because the police had no probable cause to arrest them. James also claims that the trial justice erred in admitting his oral confession.

■ The legality of an arrest is to be determined by the existence of probable cause at the time of the arrest and not what subsequent events disclose. *State v. Frazier*, R.I., 421 A.2d 546 (1980); *State v. Firth*, R.I., 418 A.2d 827, 829 (1980); *State v. Doukales*, 111 R.I. 443, 303 A.2d 769

(1973). At oral argument, West Warwick's assistant town solicitor conceded that once James and John were placed in the rear of the cage car by Cornicelli, they were under arrest. Consequently, the householder's identification of the silver coin is irrelevant to the consideration of the probable-cause issue since the arrest occurred prior to the coin incident.

■ The definition of probable cause is well established and quite familiar: it exists when, at the moment of arrest, the facts and circumstances within the police officers' knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person's believing that the prospective arrestee had committed or was committing an offense. As the term "probable cause" implies, the concept deals with probabilities, not with certainty; probable cause may exist even though the evidence before the arresting officer may not be sufficient to establish guilt. *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Palmigiano v. Mullen*, R.I., 377 A.2d 242 (1977). Whether or not probable cause exists depends upon the facts and circumstances of a particular case so that a finding of probable cause in one case seldom furnishes an easy solution in another case. The principle to be applied generally, however, is that in evaluating the reasonableness of the actions of arresting officers, a realistic, commonsense appraisal must be made of the circumstances, bearing in mind the practical considerations of everyday life on which reasonable and prudent men, and not legal technicians, act. *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *State v. Duffy*, 112 R.I. 276, 308 A.2d 796 (1973). Again, it is the cumulative effect of all the facts and circumstances present at the time of the arrest which determines probable cause, and this mosaic is to be viewed as through the eyes of a reasonable and cautious police officer on the scene, guided by his or her

experience and training. *United States v. Ashcroft*, 607 F.2d 1167 (5th Cir. 1979); *United States v. Young*, 598 F.2d 296 (D.C. Cir.1979); *United States v. Lewis*, 556 F.2d 385 (6th Cir. 1977); *State v. Holmes*, 160 Conn. 140, 274 A.2d 153 (1970); 1 LaFave, *Search and Seizure* § 3.2 at 461–62 (1978). As was so aptly stated by the then Circuit Judge Burger in *Smith v. United States*, 358 F.2d 833, 837 (D.C.Cir.1966), *cert. denied*, 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967),

> "probable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers. We weigh not individual layers but the 'laminated' total."

With these principles as our guide, we turn now to the record and first describe the locale of the break and the arrest. As noted earlier in this opinion, we have referred to Quaker Lane, Route 2, and Route 117. Insofar as these three roads are relevant to this controversy, Quaker Lane begins at a point where it meets Route 117 and runs for a considerable distance in a generally southerly direction; Route 117 starts at the point where it meets Route 2 and runs in a westerly direction, while Route 2 begins at the 117 intersection and runs southerly and parallel with Quaker Lane. The Alderic Building is situated at the easterly side of Quaker Lane.[1] The building's parking lot is on the north side of the premises, and the swamp that runs alongside the lot is situated some distance below the street level. Seventy-seven Quaker Lane is, in a manner of speaking, located across the street from the Alderic Building. At oral argument the Route 2—Quaker Lane area was described to us as being "open."

Having set the scene, we now turn to the undisputed facts. Shortly after the police had notice of the break, Cornicelli found himself stationed on Quaker Lane and Rossi reached a point on Route 2 where he could observe the two subjects located down in a depression and walking through the swamp. Cornicelli, at Rossi's direction, proceeded to the parking lot and ordered the subjects to come up out of the swamp. When they arrived on the parking-lot surface, Cornicelli observed two teen-aged boys. The parking-lot confrontation took place at three o'clock on a Friday afternoon in November. When counsel for one of the respondents asked Rossi a question which seemed to imply that the boys, as they made their way through the swamp, were on the way home from high school, Rossi informed those present that the closest high school was approximately five miles away.

■ In our considered judgment, having in mind the mosaic that we have just described, there was probable cause to arrest John and James. The average reasonably prudent person, after reading this record in the light of the practicalities of everyday living, would reasonably believe that the two swamp explorers were involved in the break across the street.

■ The respondents' complaints about the insufficiency of the evidence indicating their guilt needs little discussion. In *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), the Court stated:

> "The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person or the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." *Id.* at 235, 94 S.Ct. at 477, 38 L.Ed.2d at 440–41.

Here, Rossi's discovery of the silver dollar in John's back pocket is justified by the rule

---

1. The suppression hearing took place in the Family Court's Kent County division, which interestingly enough is located on the easterly side of Quaker Lane a short distance south of the Alderic Building.

in *Robinson.* Likewise, James's willingness to assist the police in the recovery of the loot appears to be a spontaneous desire on his part. There is not one shred of evidence that would indicate that James's desire to join the forces of law and order was in actuality the product of any coercive conduct by the West Warwick police. There is ample evidence before the trial justice indicating that James and John were the thieves who had broken into and entered the premises at 77 Quaker Lane and who did in fact carry away from that address the property that was ultimately secreted in the woods 1,000 feet away.

The respondents' appeals are denied and dismissed.