**STATE**

v.

**Mark S. BURNS.**

No. 79–520–C.A.

Supreme Court of Rhode Island.

July 1, 1981.

Dennis J. Roberts, II, Atty. Gen., Barry N. Capalbo, Sp. Asst. Atty. Gen., for plaintiff.

John L. Cosentino, Providence, for defendant.

## OPINION

BEVILACQUA, Chief Justice.

This is an appeal by the defendant, Mark S. Burns, who was indicted for two separate statutory burnings, both in violation of G.L. 1956 (1969 Reenactment) § 11–4–2. Prior to trial, the defendant filed a motion to suppress his confession and a motion to sever the two indictments for trial. The trial justice denied both motions. Upon completion of the trial, the jury returned a verdict of guilty and judgment of conviction was entered on one of the statutory-burning indictments;[1] the defendant appeals from that judgment.[2]

The record discloses that on November 29, 1977, a vacant tenement house located at 61 Althea Street in Providence was destroyed by fire. Approximately two weeks later, on December 13, 1977, the What Cheer American Legion Post located at 126 Bellevue Avenue in Providence was also destroyed by fire. While battling the blaze at the What Cheer American Legion Post, the roof of the building collapsed, causing the death of a firefighter, Lieutenant William Moreland. In the course of investigating the cause of these fires, the police arrested defendant on December 14, 1977. The exact time of the arrest, however, is in dispute; defendant contends that he was taken into custody at approximately 8 a. m., whereas the state alleges that the time of arrest was approximately 10 a. m.

---

1. The defendant was found guilty of the Althea Street fire, Indictment No. 78–94. The jury could not reach a decision regarding the What Cheer American Legion Post fire, Indictment No. 78–93, resulting in a mistrial. However, upon retrial of Indictment No. 78–93, defendant was found not guilty.

2. As a result of our disposition we need not address defendant's other claims.

At trial, the evidence indicated that on the date of his arrest, defendant was living at home with his mother and stepfather on Linwood Avenue in Providence. Additionally, the record indicates that defendant was employed as an auto mechanic by his stepfather, Andrew Kirk, owner and operator of A & R Auto located in Providence. Andrew Kirk (Kirk) testified that while at home on the morning of December 14, 1977, he received a telephone call at approximately 7:45 a. m. informing him that two Providence police detectives were looking for him. Upon receiving this message, Kirk, along with, defendant, defendant's brother Walter Burns, and another one of Kirk's fellow employees named Milford Champlain III, also known as Chico, proceeded to drive from his Linwood Avenue residence to his place of business, A & R Auto. Before arriving at his place of business, however, Kirk observed two plainclothes detectives parked at the side of the street approximately one block from A & R Auto. Thereupon, Kirk stopped his car, approached the detectives, and asked them if they were looking for him. The detectives responded by asking Kirk, "Is Mark Burns in the car with you?" Upon receiving an affirmative answer, the detectives approached Kirk's car and ordered defendant to get out of the car. The detectives then frisked defendant and put him into an unmarked police car. Following the same procedure, the detectives also took Chico into custody, placing him in the unmarked police car next to defendant. The testimony of defendant, Kirk, Chico, and Walter Burns, all indicated that defendant and Chico were taken into custody at approximately 8 a. m. Within minutes of this incident, defendant and Chico were taken to the Providence police station for questioning.

While he was being transported to the police station, defendant asked why he was being taken into custody. One of the detectives responded by saying that it was relative to a fire that had occurred the night before. Upon arrival at the station, defendant and Chico were placed in adjoining interrogation rooms. Both defendant and Chico asserted that, up to this point, they had not been advised of their rights, nor had they been apprised of the fact that they were under arrest or that they were being charged with any criminal activity.

The defendant testified also that approximately ten minutes after he was placed in the interrogation room, a plainclothes policeman entered the room and accused him of lighting the fire of the night before. The defendant denied the accusation and the policeman, according to defendant, reacted by slapping defendant in the face. Thereafter, defendant testified, during the time he spent in the interrogation room, he was questioned intermittently by two or three police officers at once. According to defendant, each time he was questioned, he denied any knowledge of the fires. At one point, two police officers told defendant that he had been implicated in the What Cheer American Legion Post fire by a juvenile, James D., and Harry Baccaire, but defendant continued to deny the accusation.

At another juncture during his detention, defendant testified that he was taken to the interrogation room where Chico was confined and was left with Chico for five to ten minutes before being returned to the room in which he had initially been confined. During this interval, according to Chico's testimony, defendant told Chico that he was being physically abused by the police and that defendant was being repeatedly accused of lighting the What Cheer American Legion Post fire. Additionally, Chico testified that defendant at this point was crying, upset, and nervous. Following this conversation between defendant and Chico, defendant was returned to the interrogation room that he had occupied originally. At this time, which was approximately 1:30 p. m., Chico was released from custody.

Later in the afternoon, at approximately 4 p. m., defendant was confronted with a juvenile, Karen Fowler. Karen Fowler had been taken into custody earlier in the afternoon of that same day, had been questioned by police officers, and had signed a statement indicating that she had seen defendant the night of the What Cheer American Legion Post fire. She was then brought

before the defendant. Upon identifying defendant, who was sitting approximately six feet away, she stated, "You guys did it." Karen Fowler testified further that defendant was crying, that his nose was swollen and bleeding, and that one of his cheeks was swollen and bruised. According to defendant, he had reacted to Karen's accusation by stating, "Karen, don't lie to them," and that Karen then burst into tears, recanted her statement, and left the room with the police officers. Finally, according to defendant, at approximately 4:05 p. m., defendant was read his constitutional rights by Lieutenant Gannon and then agreed to make a statement concerning the What Cheer American Legion Post fire. The defendant testified that at the time he made his statement, he was nervous, tired, confused, and upset. Upon completion of this statement, at approximately 6:35 p. m., defendant was again informed of his constitutional rights and he gave a statement concerning the Althea Street tenement house fire.

The testimony of the police differed from the testimony offered by defendant and his witnesses. According to police witnesses, while investigating the What Cheer American Legion Post fire, police apprehended a juvenile, James D., who upon being questioned by Colonel Robert Ricci, implicated defendant in the What Cheer American Legion Post fire. Thereupon, Colonel Ricci gave directions to have defendant picked up to Lieutenant Bernard Gannon, who in turn instructed Detectives Edward Trafford and Stephen Springer to take defendant into custody. According to Detectives Trafford and Springer, at approximately 10 a. m. on December 14, 1977, defendant was taken into custody, transported to the police station, given his constitutional rights, and briefly questioned by Lieutenant Gannon. Thereafter, at approximately 11:30 a. m., defendant was placed in the cell-block area of the police station where he remained until approximately 4 p. m. when he was confronted by Karen Fowler in the interrogation room. The defendant then agreed to give a statement concerning the What Cheer American Legion Post fire and also

implicated himself in the Althea Street tenement-house fire. Furthermore, according to police witnesses, the defendant's constitutional rights were observed at all times and defendant's allegations that he had been physically abused were unfounded.

The trial justice, after considering all the testimony presented at the suppression hearing, denied defendant's motion to suppress. The trial justice based her denial on the grounds that there was probable cause for the arrest and that any statements made by defendant were voluntarily, freely, and intelligently given, without physical or psychological coercion.

The issues raised by defendant are two-fold: (1) whether the facts within the knowledge of the police officers at the time of the arrest were sufficient to support probable cause for the arrest and (2) if the arrest was illegal, whether the taint of the illegal police conduct was attenuated by the giving of the *Miranda* warnings and other circumstances prior to the making of statements by defendant.

I

The defendant argues that his arrest was illegal because it was made without a warrant and was not based upon probable cause, and that any evidence obtained as a result of the illegal detention should have been excluded. The state concedes that defendant was seized without a warrant but asserts that the facts upon which the arresting officers acted were sufficient to constitute probable cause for the arrest. Accordingly, the state argues that it was not error to deny defendant's motion to suppress and therefore not error to admit the statements made by defendant.

The Fourth Amendment, applicable to the states through the Fourteenth Amendment, provides: "The right of the people to be secure in their persons * * * against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause * * *." *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). It is well settled that

warrants are not required in all circumstances involving arrests. *United States v. Watson,* 423 U.S. 411, 417, 96 S.Ct. 820, 824–25, 46 L.Ed.2d 598, 605 (1976); *Warden v. Hayden,* 387 U.S. 294, 298, 87 S.Ct. 1642, 1645, 18 L.Ed.2d 782, 787 (1967); *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134, 138–39 (1959); *Draper v. United States,* 358 U.S. 307, 310–11, 79 S.Ct. 329, 331–32, 3 L.Ed.2d 327, 330 (1959). When an arrest is made without a warrant, however, the Fourth Amendment's requirement of probable cause for the arrest remains absolute. *See Dunaway v. New York,* 442 U.S. 200, 208, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824, 833 (1979); *Gerstein v. Pugh,* 420 U.S. 103, 111–12, 95 S.Ct. 854, 861–62, 43 L.Ed.2d 54, 64 (1975); *Ker v. California,* 374 U.S. 23, 34–35, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 726, 739 (1963). Thus, it follows that an arrest effectuated without a warrant must be grounded on something more than mere suspicion. *See Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238, 245 (1979); *Wong Sun v. United States,* 371 U.S. 471, 479, 83 S.Ct. 407, 413, 9 L.Ed.2d 441, 450 (1963); *State v. Roach,* 106 R.I. 280, 283–84, 259 A.2d 119, 122 (1969). The only narrow exception to the requirement that Fourth Amendment seizures of persons must be based on probable cause involves the situation in which the officer makes a brief, on-the-spot stop on the street and conducts a frisk for weapons.[3] *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

▪ Initially, we note that a police officer has probable cause to make an arrest when he personally knows or reliably has been informed of facts sufficient to justify the belief of a person of reasonable caution that a crime has been committed or is being committed by the person to be arrested. *See Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879, 1890 (1949) (*quoting Carroll v. United*

*States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 555 (1925)); *State v. Smith,* R.I., 396 A.2d 110, 112 (1979); *Palmigiano v. Mullen,* R.I., 377 A.2d 242, 247 (1977). Moreover, we recognize that probable cause must exist at the time an arrest is made; probable cause cannot be grounded upon information subsequently gained. *State v. Frazier,* R.I., 421 A.2d 546, 550 (1980); *State v. Firth,* R.I., 418 A.2d 827, 829 (1980). Finally, we note that the probable-cause standard for determining the legality of a warrantless arrest is certainly no less than the same standard applied with respect to the issuance of a warrant. *See Whiteley v. Warden,* 401 U.S. 560, 566, 91 S.Ct. 1031, 1035–36, 28 L.Ed.2d 306, 312 (1971); *United States v. Ventresca,* 380 U.S. 102, 105–09, 85 S.Ct. 741, 744–46, 13 L.Ed.2d 684, 687–89 (1965).

In the instant case, Lieutenant Bernard Gannon testified that sometime during the morning of December 14, 1977, he received information from Colonel Robert Ricci that a juvenile by the name of James D. whom he had in custody had implicated defendant in the What Cheer American Legion Post fire of the night before. Lieutenant Gannon admitted that, at that time, he did not know either James D. or defendant. In response to a question by the trial justice, Lieutenant Gannon also admitted that Colonel Ricci had revealed none of the underlying circumstances upon which the juvenile, James D., had concluded that defendant had been involved in the fire of the night before. On this admittedly hearsay information alone, Colonel Ricci ordered Lieutenant Gannon to have defendant picked up and brought into the police station.[4] No attempt was ever made to obtain a warrant for the arrest of defendant. Following orders, Lieutenant Gannon instructed Detectives Edward Trafford and Stephen Springer to pick up defendant and bring him in. Consequently, defendant was taken into custody, transported to the Providence po-

---

**3.** We note that neither side in the instant case disputes that the apprehension of defendant on the morning of December 14, 1977, constituted an arrest.

**4.** At the suppression hearing, no direct evidence was presented by the state to indicate that James D. had implicated defendant in the fire. Colonel Ricci had died prior to the hearing and James D. did not testify.

lice station, and placed in an interrogation room. Eventually, after being questioned intermittently by various police officers, defendant made incriminating statements.

At the suppression hearing, the trial justice determined that the hearsay information conveyed to Lieutenant Gannon from Colonel Ricci was sufficient to constitute the requisite probable cause for the warrantless arrest of defendant. We disagree.

■ Although probable cause may be grounded on hearsay information and need not necessarily reflect the direct personal observations of the arresting officer, there must exist a substantial basis for relying on the hearsay information. *Aguilar v. Texas,* 378 U.S. 108, 114, 84 S.Ct. 1509, 1515, 12 L.Ed.2d 723, 729 (1964); *Jones v. United States,* 362 U.S. 257, 272, 80 S.Ct. 725, 736, 4 L.Ed.2d 697, 708 (1960); *cf. State v. Smith,* R.I., 396 A.2d 110, 113 (1979) (arresting officer may rely on reasonably trustworthy information that comes to him through official channels). Thus, in order to credit properly or to rely on the information conveyed, some of the underlying circumstances from which an informant implicated another in criminal activity need to be disclosed. *See Aguilar v. Texas,* 378 U.S. at 114, 84 S.Ct. at 1514, 12 L.Ed.2d at 729; *cf. State v. Soroka,* 112 R.I. 392, 397, 311 A.2d 45, 47 (1973) (no basis for arrest when information conveyed not accompanied by reasonably trustworthy information placing defendant in criminal circumstances).

■ In the instant case, Colonel Ricci told Lieutenant Gannon only that James D. had implicated defendant in the What Cheer American Legion Post fire. This statement was wholly conclusionary and failed to set forth facts sufficient to establish probable cause. Lieutenant Gannon was not informed that James D. had implicated himself as well. In fact, no other accompanying information that would tend

to lend credence to James D.'s statement concerning defendant was conveyed to Lieutenant Gannon. Moreover, we find it significant that armed with the information conveyed to him from James D., Colonel Ricci did not instruct Lieutenant Gannon to obtain an arrest warrant. Indeed, the information disclosed would have been insufficient to justify issuance of a warrant. *See Aguilar v. Texas,* 378 U.S. 108, 112–14, 84 S.Ct. 1509, 1512–14, 12 L.Ed.2d 723, 727–29 (1964). Such conduct by the police indicates that the arrest of defendant was investigatory and that defendant was taken into custody for questioning in the hope that he would make incriminating admissions.[5] *Cf. Brown v. Illinois,* 422 U.S. 590, 605, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416, 428 (1975) (arrest without probable cause was an expedition for evidence undertaken in the hope that something might turn up). Therefore, in view of all the information conveyed to Lieutenant Gannon, we feel that at the time the police apprehended defendant police clearly lacked the requisite probable cause to make the arrest. Accordingly, we find that defendant's seizure constituted an illegal arrest because it was not based upon probable cause.

## II

The remaining issue is whether the connection between the unconstitutional police conduct and the incriminating statements obtained during defendant's illegal detention was nevertheless sufficiently attenuated to permit the use of the statements at trial. The defendant asserts that his statements were the fruits of the illegal arrest and should have been suppressed at trial. The state argues that even if it were determined that the defendant was arrested without probable cause, that fact alone does not mandate exclusion per se of incriminating statements volunteered during the period of the illegal detention. Rather, ar-

---

5. In support of this proposition, we note that Lieutenant Gannon also testified as follows:

"Q Detective Gannon, is it not a fact that [defendant] never volunteered a statement, but only gave a statement after you started questioning him?

"A I think that is a fair statement, yes.
"Q Is it fair to say you prompted him to give a statement?
"A I think it is fair to say, yes."

gues the state, the inquiry becomes whether defendant's statements were the product of the illegal detention or were gained "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963) (*quoting* Maguire, *Evidence of Guilt* 221 (1959)); *see Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312 (1939); *State v. Bailey*, R.I., 417 A.2d 915, 919 (1980). Further, the state contends that there is ample evidence from which it may be concluded that defendant's statements proceeded from factors totally independent of his arrest.

The exclusionary rule prohibits the use, at trial, of evidence obtained by searches and seizures in violation of a person's Fourth Amendment rights. *See, e. g., United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561, 571 (1974); *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691–92, 6 L.Ed.2d 1081, 1090 (1961); *Weeks v. United States*, 232 U.S. 383, 398, 34 S.Ct. 341, 346, 58 L.Ed. 652, 658 (1914). The rule also forbids the use of indirect as well as direct products of an illegal arrest or search. *Wong Sun v. United States*, 371 U.S. at 484, 83 S.Ct. at 416, 9 L.Ed.2d at 453; *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 391–92, 40 S.Ct. 182, 182–83, 64 L.Ed. 319, 321 (1920). Thus, the rule mandates that statements obtained by exploitation of an illegal arrest are fruits of the poisonous tree and are to be excluded at trial. *See Wong Sun v. United States*, 371 U.S. at 485, 83 S.Ct. at 416, 9 L.Ed.2d at 454.

Such statements obtained after an illegal arrest or seizure, however, may be admissible if the state gained knowledge of the statements from an independent source. *Silverthorne Lumber Co. v. United States*, 251 U.S. at 392, 40 S.Ct. at 183, 64 L.Ed. at 321. Alternatively, if the state can show that the connection between the illegal police conduct and the discovery of the chal-

lenged evidence has "become so attenuated as to dissipate the taint," then the evidence may be admissible. *Nardone v. United States*, 308 U.S. at 341, 60 S.Ct. at 268, 84 L.Ed. at 312.

It is entirely possible, of course, as the state contends in the instant case, that a person may decide to make a statement that is "an act of free will [sufficient] to purge the primary taint of the unlawful invasion." *Brown v. Illinois*, 422 U.S. at 599, 95 S.Ct. at 2259, 45 L.Ed.2d at 424 (*quoting Wong Sun v. United States*, 371 U.S. at 486, 83 S.Ct. at 416–17, 9 L.Ed.2d at 454). The voluntariness of any statements, however, is merely a threshold requirement for Fourth Amendment analysis. *Dunaway v. New York*, 442 U.S. at 217, 99 S.Ct. at 2259, 60 L.Ed.2d at 839. Consequently, we note that the giving of *Miranda* warnings alone to an accused does not per se make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. Otherwise, "[a]rrests made without warrant or without probable cause, for questioning or 'investigation,' would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings." *Brown v. Illinois*, 422 U.S. at 602, 95 S.Ct. at 2261, 45 L.Ed.2d at 426.

Thus, the state in the instant case not only had the initial burden of showing that defendant's statements met the voluntariness standards required by the Fifth Amendment but also had the burden of demonstrating that the causal connection between the statements and the illegal arrest was broken so as to dispel the primary taint of the illegal seizure.[6] *Brown v. Illinois*, 422 U.S. at 602, 95 S.Ct. at 2261, 45 L.Ed.2d at 426. In order for us to determine on the facts of the instant case whether or not statements made by defendant were obtained by exploitation of the illegal

---

6. Because of our disposition in this case, we need not determine whether defendant's state-

ments were given voluntarily.

arrest, we must consider (1) the temporal proximity of the arrest and the confession, (2) the presence of intervening circumstances, and (3) particularly the purpose and flagrancy of the official misconduct. *Id.* at 603–04, 95 S.Ct. at 2261–62, 45 L.Ed.2d at 427.

An examination of the record in the instant case reveals that defendant made his statements some six to eight hours after he was taken into custody.[7] Moreover, from the record, we see no intervening event of significance sufficient to break the connection between the illegal arrest and the statements made. Unlike *Wong Sun*, in which the accused, after his unlawful arrest, was released and had returned voluntarily several days later to make a statement, defendant in the instant case was never allowed outside the interrogation area the whole time he was being detained. Furthermore, the illegal police conduct in the instant case "had a quality of purposefulness" because the arrest of defendant was investigatory and "embarked upon * * in the hope that something might turn up." *See Brown v. Illinois*, 422 U.S. at 605, 95 S.Ct. at 2262, 45 L.Ed.2d at 428.

We find, therefore, that the state has failed to satisfy its burden of proving that the defendant's statements were admissible and not the fruits of the illegal arrest. Accordingly, we hold that the defendant's motion to suppress was improperly denied and that the admission of the statements was error.

The defendant's appeal is sustained, the judgment of conviction appealed from is vacated, and the case is remanded to the Superior Court for further proceedings consistent herewith.

SHEA, J., did not participate.

---

7. The testimony of defendant and his witnesses indicated that the time of the initial arrest was approximately 8 a. m. whereas the state's witnesses placed the time of arrest at approximately 10 a. m. It was not until sometime after 4 p. m. that defendant signed an inculpatory statement.