**STATE**

v.

**Herman ROBINSON, Jr.**

No. 93–446–C.A.

Supreme Court of Rhode Island.

May 26, 1995.

Jeffrey Pine, Atty. Gen., Jane McSoley, Sp. Asst. Atty. Gen., Aaron Weisman, Asst. Atty. Gen., for plaintiff.

Richard Casparian, Public Defender, Paula Lynch Hardiman, Paula Rosin, Asst. Public Defenders, for defendant.

OPINION

SHEA, Justice.

This matter is before the Supreme Court on the appeal of the defendant Herman Robinson, Jr., from his conviction of murder in the first degree. For the reasons that follow, the defendant's appeal is sustained, the judgment of conviction is vacated, and the papers of the case are remanded to the Superior Court for a new trial.

The events that give rise to this appeal occurred on October 22 and 23, 1991. At

approximately 2:30 p.m. on October 22 Clifford Taylor, aged 15, was shot by a masked man in black clothing. The shooting occurred in the Manton Avenue housing project in Providence, Rhode Island. A witness in that area observed the masked man dressed in black clothing run in front of her and get into a white Toyota. The witness wrote down the registration number of the car and gave that to the police. The police broadcast the motor-vehicle number and ultimately discovered the car, parked near the home of the person to whom it was registered, Joseph Straiten of 126 Messer Street in Providence. Nine or ten police officers surrounded the house at 126 Messer Street. Three were plain-clothes detectives, and the others were uniformed. The police covered all entrances and exits and pounded on the rear door of the residence for about five minutes, shouting to be let in. The detective in charge of the investigation, one Detective Frank Altomari (Altomari), testified that the occupants would not let them in at first but, eventually, after approximately five minutes someone opened the door. Apparently all the police went into the house. They found three men, several women, and a number of children in the home. The police told the three men they were being taken to the police station for questioning. A heated argument ensued, and one of the men attempted to resist what he believed to be a warrantless arrest. The police nevertheless took the three into custody.

Altomari admitted at trial that all three men were to be brought to the station, whether they were willing or not. They were marched out of the house with police in front of them and in back of them. They were transported to the Providence police station in separate vehicles and detained in separate rooms.

Although Altomari had never met defendant previously, he had heard of him. There had been a shooting sometime earlier in which a member of this defendant's family had been seriously injured. The defendant was reported to have been a witness to that earlier shooting. The defendant's grandmother had been assisting Altomari to convince family members to go to the police and tell them what they knew of the previous event. There had been a long period of hostility and actual fighting between defendant's family and the family of the victim, Clifford Taylor.

Only defendant matched the description of the assailant; a light-skinned black male with hazel eyes. After all three men were questioned, the two who did not fit the description were released and defendant remained in custody. Altomari testified that the police discovered an outstanding capias against defendant for failure to pay court costs, and they held him in custody overnight. He said that defendant was not advised of his right to counsel or his privilege against self-incrimination because he was considered at that time to be a witness. Altomari also said that defendant was being held at this time on the outstanding capias only and that he was not under the arrest for the shooting of Clifford Taylor. The following morning, however, the police failed to bring defendant into the District Court on the capias but kept him confined at the police station throughout that day. The police detective admitted that by the second day defendant was being held as a suspect and that they did not want him released. He had still not been informed of his *Miranda* rights.

During the entire period of detention defendant was questioned repeatedly by three police officers, none of whom made any notes of their interrogation. Altomari testified that because defendant was not under arrest, he was denied consultation with counsel. He was simply detained as a suspect on the authority of the capias for failure to pay court costs. Detective Altomari stated that he was out of the police station during most of the next day and did not return to question defendant until about 6 p.m. Two of the other officers, Michael Panzarella and Steven Bathgate, questioned defendant during the day. The defendant was told that "it would be in his best interest if he wanted to tell us what happened concerning the shooting." Altomari did not know whether defendant had been fed, but he did know that he still had not, by this later point, been advised of his constitutional rights.

Finally, at approximately 6 p.m. on the second day of his detention, Detective Altomari advised defendant that he had been identified as having been at the scene of the shooting. It was at this point that defendant was given his *Miranda* rights and advised that it would be in his best interest if he wanted to tell them the story.

The identification to which Altomari referred was ultimately suppressed by the trial justice as totally unreliable. The witness to whom Altomari referred had said nothing more than it was his opinion that defendant might have killed his friend Clifford Taylor. That witness said, "I pointed out the person who I thought had done the shooting. I'm not sure whether he had done it or not." Ultimately this witness refused to testify at all and declared that he would refuse to tell the truth if he were compelled to testify. On the basis of this witness's opinion, however, defendant's status was transformed from detention on the outstanding capias to arrest as a suspect in the shooting of Taylor.

At defendant's request police contacted his grandmother, Florence Straiten, who was brought in and spoke with defendant. There is no report or record of the conversation that took place between defendant and his grandmother, during which Altomari was in and out of the room. After talking to his grandmother, defendant agreed to make a statement. At no time did Altomari ask defendant to sign a written waiver-of-rights form. He claimed that he could not find a form in the police station, which was in a state of disruption because of ongoing construction in the building. He admitted that he looked only briefly for a form because he did not want defendant to change his mind about giving a statement. Altomari testified that he still could not find a standard rights-waiver form. The form used for taking statements from witnesses was used for defendant's statement rather than the form used for a statement on the part of a person charged with a crime. The latter form would have had printed on it all of defendant's constitutional rights.

Finally the detective stated that at the time he began taking the statement, approximately 8:10 p.m., he was not aware that Clifford Taylor had died at about 4:30 p.m. that afternoon. He claimed that he became aware of the death at about 9:30 p.m., approximately twenty minutes after the written statement had been completed. It is quite remarkable that the detective in charge of the investigation was not informed of the victim's death until five hours after the victim had died.

Before trial, a hearing was held on defendant's motion to suppress his statement. The court ruled that the connection between the illegal police conduct and Robinson's confession had become sufficiently attenuated as to dissipate the taint of the illegal arrest. The court cited these as intervening events: the capias that had come to light, the fact that Robinson had been identified by a witness and advised of his rights, and the consultation with his grandmother. The defendant's motion to suppress the confession was denied. Following a jury trial defendant was convicted of murder in the first degree.

The issue before this court on appeal is whether defendant's statement should have been suppressed as the product of an illegal arrest. At the suppression hearing the state conceded that at the time defendant and the other men were taken from the Straiten residence, there was no probable cause for the arrest. The trial justice agreed. The issue, therefore is whether the confession taken after over twenty-four hours in custody was the product of the illegal arrest and detention and therefore inadmissible. We are of the opinion that it was and therefore should have been suppressed.

The roundup, without probable cause, of all three men who happened to be in the house when the police arrived was an investigative arrest that is illegal on its face. The transportation of the three men, each sandwiched between police officers, marched to separate police cars, and after arrival at the police station detained in separate rooms, constituted an arrest of all three.

On learning that there was a capias for this defendant, the police authorities could then consider that defendant was legally in their custody. That legality evaporated, however, the following morning when the

authorities failed to present defendant to the District Court. Rule 5 of the District Court Rules of Criminal Procedure provides that "an officer making an arrest under a warrant issued upon a complaint shall take the arrested person without unnecessary delay before a judge of the District Court * * * ."[1]

The illegal detention continued until shortly after 8 p.m. of the second day, at which time defendant began to give a confession. He was not advised of his constitutional rights until he agreed to give the statement. Never free to leave the police station, he was never told he could do so. He was questioned again and again by three police officers who never made a record of these sessions. He was never provided with a waiver-of-rights form. The irregularity in these police procedures completely overshadows the alleged voluntariness of defendant's waiver of his right to remain silent. On the face of the record it is certain that at the time he decided to speak, defendant thought he was confessing to an assault with a dangerous weapon and related charges. He was not told that the victim had died five hours earlier and the charge would now be first-degree murder.

In *State v. Burns*, 431 A.2d 1199, 1205 (R.I.1981), this court held that "statements obtained by exploitation of an illegal arrest are fruits of the poisonous tree and are to be excluded at trial." We also stated that the exclusionary rule "also forbids the use of indirect as well as direct products of an illegal arrest or search." *Id.* However, "if the state can show that the connection between the illegal police conduct and the * * * [confession] has 'become so attenuated as to dissipate the taint,' then the evidence may be admissible." *Id.* (citing and quoting *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312 (1939)). "[T]he giving of *Miranda* warnings alone to an accused does not per se make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal

connection between the illegality and the confession." *Burns*, 431 A.2d at 1205.

In determining whether statements were obtained by exploitation of an illegal arrest, the court considers "(1) the temporal proximity of the arrest and the confession, (2) the presence of intervening circumstances, and (3) particularly the purpose and flagrancy of the official misconduct." *Burns*, 431 A.2d at 1206 (citing *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416, 427 (1975)).

In this case the confinement that followed the illegal arrest was still ongoing at the time defendant gave a statement more than twenty-four hours later. The passage of time is of no assistance to the state because "[a] long detention, like a short one, may compound the taint of an illegal arrest." *State v. Johnson*, 118 N.J. 639, 654, 573 A.2d 909, 916 (1990). The defendant was still detained at the police station and was never advised that he could leave. During that time, furthermore, he was never advised of his right to counsel or to remain silent. He agreed to talk after a brief visit by his grandmother. We do know that the grandmother had been cooperating with the police. Since we do not know what she said to defendant or what the police had said to her, it would be pure speculation to conclude that her presence was an intervening circumstance that contributed to defendant's "ability to consider carefully and objectively his options and to exercise his free will." *Taylor v. Alabama*, 457 U.S. 687, 691, 102 S.Ct. 2664, 2668, 73 L.Ed.2d 314, 320 (1982). Furthermore, it would be safe to assume that she was not aware that her grandson would be confessing to murder.

It is clear to this court after a careful review of the record that defendant's confession was the direct result of an illegal arrest and detention during which this defendant's rights under the law were flagrantly violated. His statement of confession to the crime

---

1. The reporter's note to Rule 5 of the District Court Rules of Criminal Procedure states in part that "[t]he purpose of this requirement is to assure that the arrestee is provided with an adequate statement of his constitutional * * * rights as soon after arrest as possible, thereby minimiz-

ing the possibility of an unwitting waiver of important rights—particularly the protection against self-incrimination. * * * [A]ny confessions which might be obtained by delaying appearance before a magistrate, in all likelihood would not be admissible."

should have been suppressed. The order of the Superior Court denying defendant's motion to suppress is reversed.

We recognize that our overturning of this conviction may be perceived by some as the freeing of a confessed murderer because of a "technicality." We therefore hasten to point out that the procedural safeguards that were violated in this case guarantee constitutional rights to "those suspected of being, or known to be, offenders as well as to the innocent." *State v. Nunez*, 634 A.2d 1167, 1171 (R.I. 1993). The violation of those constitutional protections cannot be tolerated notwithstanding the consequences in any particular case.

For these reasons the defendant's appeal is sustained, the judgment of conviction is vacated, and the papers of the case are remanded to the Superior Court for a new trial.

BOURCIER, J., did not participate.