STATE

v.

James L. BROWN.

No. 2001–539–C.A.

Supreme Court of Rhode Island.

May 9, 2006.

Lauren S. Zurier, Esq., Providence, for Plaintiff.

Paula Rosin, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

On March 8, 2001, a jury found the defendant, James Brown, guilty of first-degree murder, first-degree sexual assault, larceny under $500, and selling leased property over $500. After it deliberated further, as it is required to do under G.L. 1956 § 11–23–2(4) and G.L.1956 § 12–19.2–1,[1] the jury found that the murder of

---

1. General Laws 1956 § 11–23–2 states in pertinent part:

 "Every person guilty of murder in the first degree shall be imprisoned for life. Every person guilty of murder in the first degree: * * * (4) committed in a manner involving torture or an aggravated battery to the victim * * * shall be imprisoned for life and if ordered by the court pursuant to chapter 19.2 of title 12 that person shall not be eligible for parole from imprisonment."

The relevant portion of G.L.1956 § 12–19.2–1 provides in pertinent part:
 "In all cases tried by a jury in which the penalty of life imprisonment without parole may be imposed pursuant to § 11–23–2 or 11–23–2.1, and in which the attorney general has recommended to the court in writing within twenty (20) days of the date of the arraignment that such a sentence be imposed, the court shall, upon return of a verdict of guilty of murder in the first degree by the jury, instruct the jury to deter-

the victim, Pamela Plante, involved torture and/or aggravated battery. After he denied Brown's motion for a new trial, the trial justice sentenced him to life imprisonment without parole on the murder count. The trial justice also sentenced Brown to life imprisonment for sexual assault, one year's imprisonment for larceny, and ten years for selling leased property. All sentences were to be served consecutively.

Brown filed a timely notice of appeal and he challenges the judgment of conviction on four grounds. First, Brown argues that the trial justice erred when he denied his motion to suppress certain statements Brown made to the Woonsocket police, as well as a DNA sample he provided. Brown also contends that the trial justice erred when he declined to instruct the jury that the defense did not have the burden of proving beyond a reasonable doubt its theory that someone else committed the murder. In addition, defendant argues that the trial justice made a reversible error when he denied his request to instruct the jury about the lesser-included offense of second-degree murder. Finally, Brown maintains that it was error for the trial justice to impose a life sentence without the possibility of parole in the face of substantial mitigating circumstances. For the reasons set forth herein, we deny the defendant's appeal and affirm the judgment of conviction.

## Facts

An unsettling story of addiction, crime, and violence serves as the backdrop of Pamela Plante's terrifying murder. A thirty-two-year-old mother of two young children, Pam lived in Woonsocket and worked at a nearby B.J.'s Warehouse store. She shared the upbringing of her youngest children with their father, Pam's ex-boyfriend Peter Guerard. She was close to her family and spoke with her parents and siblings on a regular basis. Beneath the veneer of this seemingly ordinary life, however, Pam suffered from an addiction that stole her away from her family. She sometimes disappeared for days with other drug users to get high.

The evening of April 2, 1998, began innocently. On that evening, Pam and her children went out to dinner with Constance Fregeau, Pam's mother. After dinner, Constance dropped Pam and the children at Pam's apartment. Pam told her mother that the children would be spending the night with their father and that she planned to stay home and relax. However, Pam did not remain at home. Instead, she, defendant, and a man named Bernie Williams went to the home of Eddie Burke to drink and smoke cocaine. At some point that night, Pam and Brown left Burke's house together. Brown returned alone about an hour later. At about 11 p.m., Brown and Williams left Burke's home. At that time, Brown told Williams that he wanted to sleep with Pam, and he asked Williams if he wished to accompany him. Williams declined and went his own way, but Brown headed in the direction of Pam's apartment.

A few days later, Constance began to worry because she had not heard from Pam. She drove by Pam's apartment a few times and noticed that the lights in the house were on, even though her daughter was not answering her phone and her car

mine whether it has been proven beyond a reasonable doubt that the murder committed by the defendant involved one of the circumstances enumerated in § 11–23–2 or 11–23–2.1 as the basis for imposition of a sentence of life imprisonment without parole. If after deliberation the jury finds that one or more of the enumerated circumstances was present, it shall state in writing, signed by the foreperson of the jury, which circumstance or circumstances it found beyond a reasonable doubt."

was not in the driveway. Growing more and more concerned, Constance borrowed a spare key from Peter Guerard and entered the apartment on Sunday morning, April 5, 1998. In the living room, Constance discovered the brutalized and lifeless body of her slain daughter on the floor, crammed between the coffee table and sofa. There was a large stain on the floor as well as shards of broken glass. Pam's shirt was bloody and there was a maroon place mat draped over her. Terrified, Constance ran to the kitchen to use the telephone to call for help. There was no dial tone, however, because someone had removed the cord.

Police later determined that Pam's hands and neck were bound with the telephone cord and tie backs from the living room curtains. The sofa and surrounding area were bloodstained. Pam's right breast was exposed and her bra pushed up. One leg of her black jeans had been cut from the ankle to the waist band and around the front to the crotch area. Her underwear appeared to have been partially cut or ripped off and her lower torso was nude. The sock on Pam's left foot had a used tampon stuffed inside it. Forensic tests confirmed the existence of seminal fluid in Pam's vagina, on the rug, and on the bottom of the inner right leg of the black jeans, which were cut and hanging from her.

A subsequent examination of Pam's remains illuminated even more fully the grim circumstances of her death. Strands of her own hair entwined in her bloody fingers indicated that she had struggled to remove the cord and ties from her neck. She also had defensive cuts on her hands suggesting that she tried to resist her attacker. Burst blood vessels in her eyes established that she had been strangled before she died. Pam was also stabbed several times in the neck, and a serrated kitchen knife consistent with these wounds was found in the bathroom sink. The assailant had plunged the blade four and one half inches into her neck, piercing her trachea, or breathing tube, and causing blood to enter her airway.

The medical examiner determined that Pam died late Thursday evening (April 2) or early Friday morning (April 3) as the result of both asphyxiation caused by strangulation and the stab wound that pierced her trachea. It was patently clear that her killer had left her to die a slow and agonizing death. According to the medical examiner, neither the stab wound nor the ligature around her neck would have killed her instantly. Rather, because the telephone cord was wrapped tightly around her neck and also attached to her hands (which were bound behind her back), only by keeping her hands high in an unnatural and uncomfortable position could Pam prevent her strangulation. As she struggled to free her hands, and as her muscles fatigued from trying to keep them in this abnormal position, Pam would have inevitably tightened the cord around her neck and thereby cut off the flow of blood to her brain. In this condition, the medical examiner concluded that Pam could have fallen in and out of consciousness as the pressure from the cord around her neck loosened and tightened, until she finally expired.

A little over eleven months after Constance Fregeau discovered her daughter's mangled body, the Woonsocket police received information that Brown was one of the last people who had been in Pam's company before she died. Detective Luke Simard testified that he contacted Brown after receiving this information and he asked him to come to the police station so the police might learn what he knew of the circumstances surrounding Pam's death. Brown expressed a desire to be helpful,

but he also told the detective that he could not come that evening because he was working in Worcester from 6 p.m. until 2 a.m. However, Det. Simard also called Joyce Roberson, Brown's then girlfriend, who contradicted Brown's story and informed him that she expected Brown to be home at around 9 o'clock that evening. Detective Simard asked Roberson to call him on his cell phone when Brown returned home. When Brown arrived, Roberson phoned Det. Simard. The detective spoke to Brown on the telephone, and Brown agreed to go to the police station. During this time, however, the vigilant Simard had been staked out on the street in front of Brown's home. When he observed Brown get into a car driven by Latoya Everett, Det. Simard and other detectives pulled the car over, informed Brown that there was an outstanding warrant for his arrest, and took him into custody on the authority of a District Court capias.

That capias, (or bench warrant), was issued on October 5, 1998, after Brown failed to appear at a hearing to review payments that he owed in three separate District Court criminal cases (case Nos. 61–98–07620, 61–98–12195, 61–98–13929). The warrant contained a pre-endorsed bail in the amount of $1,288.50 [2] and instructed any authorized officer to arrest Brown and to present him to the District Court, or to commit him to the Adult Correctional Institution (ACI) until he posted bail.

Brown was taken to the Woonsocket police station and within approximately one half hour after being apprehended he waived his *Miranda* rights and consented to give a videotaped interview concerning the murder of Pamela Plante. Toward the end of this six-hour interview, Brown agreed to give the police a blood sample for DNA testing. Police transported Brown to Landmark Medical Center for that purpose at about 8:30 a.m. on March 6, 1999.[3] He then was brought back to the station and eventually taken to the ACI.[4]

During Brown's initial interview at the police station on March 5, 1999, Brown said that he had last seen Pam on the Monday or Tuesday before she died. Brown explained that after work, he had gone to Eddie Burke's house, where he was joined by his friend, Bernie Williams. Pam arrived at Eddie's sometime later. Thereafter, Brown, Williams, and Pam went to Pam's home, where she made a few phone calls in an effort to scare up some money. He said that he and Williams stood around in the living room and waited for her. When Pam was finished with her phone calls, the three left; Brown and Pam went to a local bar for about an hour and a half, and Bernie returned to Eddie's house. According to defendant, Pam told him that a man named Otis had been threatening her. After awhile, Pam asked Brown to walk her home, but Brown refused. Pam walked home alone and Brown walked back to

---

2. The bail amount consisted of the aggregate payments due in the District Court cases, plus a $125 fee.

3. The state concedes that a bail commissioner was available at the Woonsocket police station on Saturday morning, as well as at the ACI.

4. On March 8, 1999, Brown was presented in the District Court and the bench warrant was quashed. The amount of bail set forth in the warrant was reduced from $1,288.50 to $750, and Brown was scheduled to appear in court on March 12, 1999 for payment review. Due to some mix-up at the ACI, prison officials failed to bring Brown to District Court on March 12, and the court issued another bench warrant for his arrest on the basis of his failure to appear. This second warrant was withdrawn, however, when Brown finally was brought to the District Court for his payment review on April 21, 1999.

Eddie's and then eventually he went home. Brown denied having sexual relations with Pam.

A week later, on March 12, 1999, while Brown was being held at the ACI, the police again interviewed him. Brown, for the most part, recounted his previous story. But, this time he admitted to having sex with Pam and recalled that it had occurred on Wednesday, April 1, 1998, the day before her murder. Brown said that Pam was wearing light blue jeans and that she was not menstruating at the time they had sex. Brown further recalled that he saw Pam again on Thursday, April 2, the day of her murder. He said that he and Bernie Williams went to Pam's apartment for awhile after work, and then went to Eddie Burke's house without Pam. Brown told the police that he remembered the black jeans that Pam was wearing that day, because he and Williams had commented to each other about how good she looked in them. Later that evening, Brown said he returned to Pam's apartment but discovered that a man named Otis was there and he would not let Brown inside the house. Brown saw Pam briefly and then left. Brown claimed he went to a bar for awhile and then home, where at around 11:30 p.m. he called Pam. Otis answered, and so Brown pretended to be Peter Guerard, the father of Pam's two youngest children. Brown maintained that he spoke briefly with Pam and that she told him that Otis was angry because she refused to sleep with him. Brown also told police that the following day, Friday, April 3, he saw Otis at a bar and that Otis threatened to hurt Brown and his family if he ever told anyone that Otis was at Pam's

house the night before. During this second interview, the police confronted Brown with the results of the DNA testing, which revealed that the semen found on Pam's black jeans was his.

## Analysis

### I

### Motion to Suppress

██ On appeal, Brown first contends that the trial justice erred when he denied his motion to suppress the initial statement obtained at the police station on March 5–6, the DNA sample garnered on March 6, and the second statement, given at the ACI on March 12. Brown argues that according to Rule 9(a)[5] of the District Court Rules of Criminal Procedure and G.L.1956 § 12–13–2, the arresting officers had an affirmative obligation (1) to inform him that bail had been pre-endorsed on the warrant, and (2) to provide him with an immediate opportunity to post bail. He contends that a violation of these requirements warrants the suppression of this evidence.[6] We begin our analysis with a thorough review of the authorities upon which Brown rests his appeal.

Section 12–13–2 states in pertinent part: "Any court before which an indictment or information shall be found or be pending, and any court before which a complaint shall be made or be pending, against any person for an offense of which the court has cognizance, may issue a warrant directed to each and all sheriffs, deputy sheriffs, town sergeants, and constables within the state requiring them to apprehend the person and bring

---

5. Although the parties below, and Brown on appeal, referenced Rule 5(a) of the District Court Rules of Criminal Procedure, the state points out, and Brown concedes, that Rule 9(a) of the District Court Rules of Criminal Procedure is the applicable rule in this case.

6. The defendant has not advanced a constitutional argument for an application of the exclusionary rule. *See State v. Nardolillo*, 698 A.2d 195, 199 (R.I.1997).

him or her before the court, if the court is in session, or if not, to commit him or her to jail in the county in which the indictment, information, or complaint is pending, there to be kept until he or she shall be brought before the court, *or until he or she shall give recognizance before some person authorized to take recognizance for the offense, with sufficient surety or sureties in the sum named in the warrant, if any sum is named in the warrant * * *."* (Emphasis added.)

Rule 9(a) provides:

*"Appearance Before A District Judge.* Unless otherwise provided by statute, an officer making an arrest under a warrant issued upon a complaint shall take the arrested person without unnecessary delay before a judge of the District Court as commanded in the warrant. Any person making an arrest without a warrant shall take the arrested person without unnecessary delay before a judge of the District Court for the division in which the arrest was made or in which the crime was committed. When a person arrested without a warrant is brought before a judge, a complaint shall be filed forthwith. *Whenever an arrest shall be made, the arrested person shall be afforded a prompt hearing for the purpose of admission to bail before a judge of the District Court or an officer authorized to bail persons; if the arrest is made pursuant to warrant and the amount of bail has been endorsed on the warrant, the person shall also be entitled to be taken promptly before an officer authorized to accept bail."* (Emphasis added.)

Brown contends that the statute and court rule cited above secure the right to immediate release if an arrestee can post the bond required on a warrant already endorsed with the bail set. Implicit in these provisions, he argues, is the duty of the arresting officers to inform the person arrested of his right to post bail and be released. When he denied Brown's motion, the trial justice found that the period of a half hour preceding Brown's interview, in which he was in police custody but remained uninformed of his right to post bail, "was a reasonable amount of time" and that the issue of bail became "moot" once he signed the rights form and began to talk to the police.

When interpreting statutes and court rules, we apply a *de novo* standard of review. *Jacksonbay Builders, Inc. v. Azarmi,* 869 A.2d 580, 583 (R.I.2005); *Gucfa v. King,* 865 A.2d 328, 331 (R.I.2005) ("The interpretation of court rules is a question of law."). Section 12–13–2 of the General Laws authorizes a court of competent jurisdiction to issue an arrest warrant directing the appropriate officials to apprehend a named individual and, where the bail amount is written on the warrant, to imprison that person until recognizance is given before someone authorized to take recognizance for the offense. Rule 9 provides that when an arrest is made, the arrestee shall be given a prompt hearing before the District Court or an officer authorized to bail persons, for the purpose of being admitted to bail. In addition, if the arrest is made pursuant to a warrant and the amount of bail is set forth on the warrant, the arrestee also shall be entitled to be taken promptly before an officer authorized to accept bail.

Here, the Woonsocket police apprehended Brown on the street and within thirty minutes he had voluntarily signed a waiver of rights form and began talking to detectives about Pamela Plante. Although the police had a duty under Rule 9(a) to take Brown "promptly" before an officer authorized to accept bail, it is our opinion that the fact that they did not do so within

the first thirty minutes that he was in custody does not violate the promptness mandate of Rule 9. We distinguish the facts present here from *State v. Robinson*, 658 A.2d 518 (R.I.1995). There, the defendant was taken to the police station as a suspect in a shooting. *Id.* at 519. While Robinson was being held there, the police discovered that there was an outstanding capias for him for failure to pay court costs, and they held him overnight. *Id.* Instead of presenting Robinson to the District Court the following morning pursuant to Rule 5 of the District Court Rules of Criminal Procedure, however, the police kept him in custody. *Id.* Throughout the following day, the officers relentlessly interrogated Robinson without ever informing him of his *Miranda* rights or providing him with a waiver of rights form. *Id.* at 519–20. At around 6 p.m. that day, they told him that he was identified as having been at the scene of the shooting and they finally informed him of his rights. *Id.* at 520. Approximately two hours later, Robinson agreed to give a statement to the police. *Id.*

The issue before us in that case was whether a confession, which was given after over twenty-four hours in custody, was the product of an illegal arrest and detention. *Id.* We held that although Robinson was legally detained on the authority of the capias, "[t]hat legality evaporated * * * the following morning when the authorities failed to present the defendant to the District Court." *Id.* at 520–21. It is well settled that statements obtained by exploitation of an illegal arrest are fruits of the poisonous tree and should be excluded at trial. *State v. Burns*, 431 A.2d 1199, 1205 (R.I.1981). However, if the connection between the illegal police misconduct and the statement has become so attenuated as to dissipate the taint, then the evidence may be admissible. *Id.* Ac-

cordingly, we considered whether, on the facts before us, there was sufficient attenuation such as to render Robinson's statement admissible. We noted that the police informed Robinson of his rights, but also acknowledged that "the giving of *Miranda* warnings alone to an accused does not per se make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession." *Robinson*, 658 A.2d at 521 (quoting *Burns*, 431 A.2d at 1205). We concluded that Robinson's confession was the direct result of the illegal arrest and detention during which the police "flagrantly" violated his rights, and we overturned the conviction on the basis that his confession should have been suppressed. *Id.*

The circumstances of the case presently before us clearly differ from the troubling police misconduct portrayed in *Robinson*. Especially significant is the distinction that in *Robinson* the defendant was detained for over twenty-four hours on the authority of a capias before he confessed, while here, Brown had been in custody only for approximately thirty minutes before he agreed to talk to detectives. Because the police in *Robinson* clearly violated the mandate of Rule 5(a) that "an officer making an arrest under a warrant issued upon a complaint shall take the arrested person without unnecessary delay before a judge of the District Court[,]" Robinson's continued detention was illegal and in violation of his rights. With respect to Brown, it is our firm opinion that the Woonsocket police violated neither the prescription in Rule 9 that a person arrested pursuant to a warrant upon which the amount of bail has been pre-endorsed is entitled to be taken promptly before an officer authorized to accept bail nor the directive of § 12–13–2 that an arrestee should be brought before someone authorized to take recognizance.

■ We further distinguish *Robinson* in that there, we held that the "defendant's confession was the direct result of an illegal arrest and detention[.]" *Robinson*, 658 A.2d at 521. It is well settled that to render a confession inadmissible, a delay in presentment must have been operative in inducing the confession. *State v. Nardolillo*, 698 A.2d 195, 199 (R.I.1997). Here, Brown waived his *Miranda* rights in writing and spoke freely to the police almost as soon as he arrived at the station. We have thoroughly reviewed the record and are convinced that Brown's statement was not induced because the police did not present him to someone authorized to take bail in the thirty minutes after they apprehended him on the street.

■ Although we are satisfied that the police in this case did not violate Rule 9's promptness directive, we also will address Brown's argument that Rule 9 and § 12–13–2 place an affirmative duty on the police to notify an arrested person of his right to post pre-endorsed bail and obtain release. To support this position, Brown directs our attention to case law from this and other jurisdictions. In *State v. Carcieri*, 730 A.2d 11 (R.I.1999), we were presented with the question of whether G.L. 1956 § 12–7–20, which affords an arrested person the right to a confidential telephone call, is violated when a police officer fails to inform an arrestee of his or her right to a confidential telephone call. We held that although § 12–7–20 on its face contains no requirement of notification, such notice is nevertheless implicitly required by the statute. *Carcieri*, 730 A.2d at 15. We tempered this holding by adding that the failure to notify a suspect of his right to make a phone call "is not fatal to the state's case unless a defendant is prejudiced thereby." *Id.* Brown analogizes that just as the police must notify an arrestee of his or her right to make a phone

call, the police also must notify a person arrested on the authority of a bench warrant with pre-endorsed bail of his or her right to post bail and be released. We disagree.

Rule 9(a) states that a person arrested on a warrant on which the amount of bail has been pre-endorsed "shall also be entitled to be taken promptly before an officer authorized to accept bail." Section 12–13–2 directs an officer who arrests a person on the authority of a warrant on which the amount of bail is set to hold the arrestee until he or she gives recognizance before someone authorized to accept it. In contrast, § 12–7–20 provides that "[a]ny person arrested under the provisions of this chapter shall be afforded, as soon after being detained as practicable, not to exceed one hour from the time of detention, the opportunity to make use of a telephone for the purpose of securing an attorney or arranging for bail * * *." Although it is true that "in order to enjoy the benefit mandated by § 12–7–20, a suspect must be informed of his or her right to a confidential telephone call," *Carcieri*, 730 A.2d at 15, it is simply not the case that an arrestee can leverage his right to post a pre-endorsed bail only if he is notified of his ability to do so.

This is because an arrested person will benefit from the rule requiring prompt presentment whether or not he is aware that it exists. Rule 9 and § 12–13–2 operate as procedural instructions or guidelines that notify the police of the steps that must be taken after they effectuate an arrest. Unlike the phone call statute, where it is up to the arrestee to decide whether he wants to make a call, a police officer is *required* to promptly take a person arrested on a pre-endorsed bench warrant before an officer authorized to accept bail. Therefore, we are of the opinion that unlike our interpretation of § 12–7–20 in

*Carcieri,* we need not read a duty to notify into either Rule 9 or § 12–13–2.

Our review of the cases from other jurisdictions cited by Brown in his brief reinforces our resolve in this holding. First, we note that all the cases that we will discuss below differ from this case in that they all involve the suppression of evidence obtained during an inventory search, rather than a statement given after *Miranda* rights were waived. In *State v. Smith,* 56 Wash.App. 145, 783 P.2d 95 (1989), the third division court of appeals of Washington state reversed a trial justice's denial of a motion to suppress because the defendant was not advised of her right to post pre-endorsed bail before she was subjected to an inventory search. But, a Washington statute required that " '[t]he officer making an arrest must inform the defendant that he acts under the authority of a warrant, *and must also show the warrant* [.]' " *Id.* at 96. (Emphasis added.) In *Smith,* the defendant was arrested on the authority of a warrant for failure to comply with a court order on a charge of operating a motor vehicle without a valid operator's license. *Id.* The bail amount written on the warrant was a paltry $25. *Id.* It was undisputed that at the police station, an officer dumped out the contents of Ms. Smith's purse *while* another officer read the warrant to her. *Id.* The court held that Ms. Smith was not advised in a timely manner of the opportunity to post bail because the officers did not read the warrant to her before conducting the inventory search.[7] *Id.* at 98. The inventory search was ruled unlawful because Ms. Smith was not shown the warrant in a timely manner, as required by statute. *Id.*

It is important to note, however, that the Washington statute upon which the court's decision in *Smith* rests differs substantially from the statute and Court Rule at issue here. The Washington statute essentially required the police to notify an arrestee of his right to post bail because it instructed the arresting officer to show the warrant (upon which the amount of bail is written) to the person being arrested. *Smith,* 783 P.2d at 96. Neither Rule 9 nor § 12–13–2 contain such a directive. Rule 9 merely requires the arresting officer to promptly take the arrestee before an officer authorized to accept bail. Therefore, we believe that although the legislature in Washington intended that an arrestee be notified of his right to post bail, our legislature has evinced no such intent.[8]

Brown also relies on *People v. Dixon,* 392 Mich. 691, 222 N.W.2d 749 (1974), in his effort to convince us that implicit in Rule 9 and § 12–13–2 is a mandatory obligation on the police to inform a defendant of the right to post bail on a pre-endorsed warrant. The statute at issue in *Dixon* provided that "whenever a person is arrested without a warrant for a misdemeanor * * * the arresting officer shall take him without unnecessary delay before the most convenient magistrate to answer the complaint." *Dixon,* 222 N.W.2d at 752. But, in addition, it provided that "if no magistrate is available, the arrested person may recognize to the direct supervisor of the arresting officer or department * * * by leaving a sum of money not to exceed $100 * * *." *Id.* at 753. The defendant in *Dixon* was arrested for operat-

7. The court also said that it must presume that Smith would have been capable of paying the $25 had she been given the opportunity to do so. *State v. Smith,* 56 Wash.App. 145, 783 P.2d 95, 98 (1989).

8. We also distinguish another Washington case, *State v. Caldera,* 84 Wash.App. 527, 929 P.2d 482 (1997) on the same rationale because its holding relied on a statute that was substantially similar to the one at issue in *Smith.*

ing a motor vehicle with a suspended license. *Id.* at 750. The police conducted a contemporaneous frisk, which revealed that the defendant was not carrying a weapon, and they brought him to the county jail. *Id.* At the jail, the officers ordered the defendant to remove his sweater, and after searching its pockets, they found capsules of heroin. *Id.* at 752. The court noted that "[t]he district court in the district where the jail was located had established by general order a standard bail of $35 for the release of an offender charged with driving without a license." *Id.* at 753. The court held that "the sense of the statute and its purpose of avoiding unnecessary incarceration of minor offenders can only be served by imposing on the arresting officer * * * the duty to inform the person about to be jailed of the statutory protection of which he otherwise would probably be ignorant." *Id.* at 754.

In distinguishing *Dixon,* we observe that the statute at issue there allowed bail to be posted with the direct supervisor of the arresting officer. In addition, the amount of bail in that case was $35. *Dixon,* 222 N.W.2d at 753. In comparison, Rule 9 instructs an arresting officer to bring the person arrested on a warrant with pre-endorsed bail before "an officer authorized to accept bail." Section 12–13–4, entitled "Persons authorized to bail jail prisoners," states that where the amount of bail for the prisoner has previously been set, the bail can be taken by a duly authorized justice of the peace, or by the senior prison officer in charge at the ACI, if the arrestee requests that the bail be taken.

While the statute at issue in *Dixon* permitted an arrestee to post bail with a police officer at the stationhouse, such an opportunity is not provided for under Rhode Island law. In this state, only a justice of the peace or the senior prison official at the ACI may accept bail, not a police officer at the stationhouse. Section 12–13–4. Our statute also explicitly places the onus of requesting the opportunity to post bail on the prisoner or his or her counsel. *Id.* These differences render the reasoning in *Dixon* inapplicable to the facts before us.

Brown also cites *Zehrung v. State,* 569 P.2d 189, 195 (Alaska 1977) in which the Alaska Supreme Court held:

"[W]hen one is arrested and brought to jail for a minor offense for which bail has already been set in a bail schedule, he should be allowed a reasonable opportunity to attempt to raise bail before being subjected to the remand and booking procedures and the incident inventory search."

In reaching this decision, the Alaska Supreme Court relied heavily on the Michigan Supreme Court's decision in *Dixon.* The Alaska court explained that while the holding in *Dixon* was based in part on the arrestee's "clear statutory right to release without incarceration," *Zehrung,* 569 P.2d at 192, "[n]o such clear statutory right to release on bail without even temporary incarceration exists in Alaska." *Id.* at 193. Nevertheless, the court decided the case on what it called the "nonstatutory rationale of *Dixon.*" *Id.* It held that a warrantless jailhouse inventory search "is without justification when an arrestee is not going to be incarcerated, and it is therefore constitutionally impermissible." *Id.*

We do not believe *Zehrung* to be persuasive. It is grounded in the Alaska Constitution, and as Brown concedes, he does not appeal his conviction, at least with respect to the issue of suppression, on constitutional grounds. In addition, we held in *Nardolillo,* 698 A.2d at 199, that Rule 5(a) of the Superior Court Rules of Criminal Procedure is "not a constitutional command to be found within the text of

our Federal or State Constitutions, and its breach does not necessarily create any constitutional violation." The relevant language in Rule 5(a) is substantially identical to that of Rule 9(a) of the District Court Rules of Criminal Procedure, which Brown claims the Woonsocket police violated. Because Brown does not allege a violation of his constitutional rights as the basis of this appeal, and because breach of Rule 9(a) does not necessarily create a constitutional violation, Brown's reliance on *Zehrung* is misplaced.

We differentiate *United States v. Mills,* 472 F.2d 1231 (D.C.Cir.1972), on which Brown also relies, on similar grounds. In *Mills,* the Court of Appeals held that the defendant should have been informed of his opportunity to post collateral and leave the precinct station before a pre-detention inventory search was conducted. *Id.* at 1234. The Court, however, expressly decided *Mills* on the basis that the search conducted was unreasonable under the strictures of the Fourth Amendment to the United States Constitution. *Id.* at 1232–33. Moreover, at odds with the situation here, it was stipulated in *Mills* that it was the regular police practice in that jurisdiction for both the arresting officer and the booking officer *to advise* those eligible for collateral of the collateral system.[9] *Id.* at 1236. The Court ruled that Mills was not provided with this opportunity; therefore the inventory search to which he was subjected was unreasonable. *Id.* at 1234. The court in *Mills* also said that its decision was "fortified by the fact that the stationhouse clerks who have the function of booking offenders * * * are also serving as acting clerks of court * * * during the hours when court is not in session."

*Id.* at 1239. Because the Fourth Amendment is not before us on appeal, and because the facts of that case are easily distinguishable from those before us, we believe that the Court of Appeals' decision in *Mills* is inapplicable.

We have thoroughly reviewed the record in this case as well as the authorities cited by both Brown and the state. There is no statutory authority or case law that would justify a holding that the Woonsocket police had a duty to inform Mr. Brown that he was entitled to prompt presentment before a person authorized to accept bail. Brown was in custody for only thirty minutes before he began talking to the police about Pamela Plante's murder. This minimal delay does not constitute a violation of § 12–13–2 or the promptness requirement of Rule 9. Because we hold that the police did not violate Rule 9 or § 12–13–2, neither the initial interview, the DNA sample, nor the statement obtained on March 12 are products of an unlawful detention.

In summary, we have analyzed defendant's arguments on this issue and find them unpersuasive. In our opinion, the only obligation that the Woonsocket police had after lawfully arresting Brown, pursuant to an active capias, was to present him to a judge or bail commissioner promptly. The delay of less than a half hour, which included the time it took to transport him to the police station, was not a violation of that obligation. It is further our opinion that the police had every right to inquire of Brown what he knew about a murder that had cast him under a cloud of suspicion. Finally, we reject defendant's assertion that there was an affirmative duty on the police to inform him that he might attain his immediate release by simply

9. The law in place at the time *United States v. Mills,* 472 F.2d 1231 (D.C.Cir.1972) was decided provided that people arrested for committing certain offenses could post collateral and avoid being detained. Mills was charged with committing one of these offenses for which collateral was $50.

posting the preset bail. Accordingly, we affirm the trial justice's decision to deny Brown's motion to suppress.

## II

### Third Party Perpetrator

■ Throughout his trial, Brown introduced evidence designed to demonstrate that Peter Guerard, the father of Pam's youngest children, was her murderer. This evidence, he asserts, was relevant to the jury's determination of whether the state proved its case against Brown beyond a reasonable doubt.

At the close of the evidence, Brown requested that the following instruction be given to the jury.

"In this case the defendant has introduced evidence that another party, Peter Guerard, was responsible for the murder of Pamela Plante. The defendant does not need to prove to you beyond a reasonable doubt that Peter Guerard committed this crime. In fact, the defendant need not even prove that there's a strong possibility that Peter Guerard committed this crime. That's because only the state has the burden of proof. But if an examination of the evidence concerning Peter Guerard causes you to have you have [*sic*] a reasonable doubt as to the defendant's guilt, then you must find the defendant not guilty."

The trial judge declined to honor Brown's request. Brown maintains that this was error, because the requested instruction was a correct statement of the law and because without this instruction, the jury may have begun its deliberations persuaded that Brown carried the burden of proving Guerard's guilt beyond a reasonable doubt.

■ We affirm a trial justice's instructions to the jury when they "ade-quately cover the law and, when viewed as a whole from the perspective of a jury that is composed of ordinary, intelligent lay people, the instructions do not reduce or shift the state's burden of proof." *State v. Ensey*, 881 A.2d 81, 95 (R.I.2005). A trial justice's refusal to grant a particular request for jury instructions does not constitute reversible error if, overall, the judge's charge to the jury fairly covers the requested instruction. *State v. Hallenbeck*, 878 A.2d 992, 1008 (R.I.2005). Moreover, we review the validity of an instruction by examining the challenged portion, not in isolation, but in the context of the entire charge. *Id.*

Although the trial justice did not adopt the particular language that Brown requested, he told the jury that "[t]he burden of proof is on the state * * * [i]t never shifts to the defendant * * * [t]he defendant need not prove anything." The trial justice also instructed the jurors to consider all the evidence presented, and reminded them of the presumption of innocence to which Brown was entitled. He explained that the presumption of innocence would leave Brown only if all twelve jurors decided that "the state has, in fact, proven their case beyond a reasonable doubt that the defendant is guilty."

After thoroughly reviewing the trial justice's instructions to the jury, we are convinced that he did not commit error in refusing to instruct the jury in exact accord with Brown's request. We are satisfied that the instructions that were given, when viewed as a whole from the perspective of a jury composed of ordinary, intelligent lay people, made it clear that the state had the burden of proving Brown's guilt beyond a reasonable doubt on each and every element of the crimes charged and that the burden of proof never shifted to Brown to prove his own innocence. The instructions given accurately reflected the

law and adequately covered the requested instruction. Therefore, the trial justice did not commit error.

## III

### Lesser–Included Offense

■ Brown also contends on appeal that the trial justice erred when he refused to instruct the jury on the lesser-included offense of second-degree murder. The state, while maintaining that Brown is not entitled to a second-degree murder instruction, also raises as a threshold issue that Brown has waived any appeal on this issue. According to the state, defendant offered no theory of the evidence that would justify an instruction on second-degree murder nor did he give sufficient grounds for the objection. Therefore, according to the state, he failed to meet the requirements of Rule 30 [10] of the Superior Court Rules of Criminal Procedure. We disagree.

■ We have said that "[c]onsistent with Rule 30, '[a] failure to object to a jury instruction precludes review of the instruction on appeal.' * * * Moreover, '[g]eneral objections to instructions, without specific grounds are not a sufficient basis for review by this Court.'" *Hallenbeck*, 878 A.2d at 1007. The record reveals that Brown submitted an instruction request on second-degree murder, and when it was not given to the jury he objected as follows: "Lastly, Judge, I have requested a lesser included Second Degree Murder instruction. I would ask—I would state for the record that there's evidence to support a Second Degree and I would ask for such an instruction." The instruction Brown requested was as follows:

"Second degree murder is any killing of a human being committed with malice aforethought that is not defined by statute as first degree murder. Malice aforethought consists of an unjustified disregard for the possibility of death or great bodily harm and an extreme indifference to the sanctity of human life. This element of second degree murder may be established by any of the following means: 1) a showing of premeditated intent to kill in the mind of the accused for a very brief time before the killing; 2) proving the defendant's conscious disregard for the possibility of death or great bodily harm."

■ The purpose of Rule 30 is to notify the trial justice, with clarity and specificity, of any deficiencies in the charge so that the alleged error may be cured before the jury retires for deliberations. *State v. Crow*, 871 A.2d 930, 935 (R.I.2005); *State v. Hanes*, 783 A.2d 920, 924 (R.I.2001). Here, Brown timely objected to the jury instructions before the jury began its deliberations.[11] Moreover, Brown's objection

10. Rule 30 of the Superior Court Rules of Criminal Procedure provides:

 "At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the request. At the same time copies of such request shall be furnished to adverse parties. If a defendant relies upon an affirmative defense, or justification, or matter in mitigation and wishes the court to instruct the jury with respect to such, he or she shall so advise the court in writing no later than at the close of the evidence. No party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection. Objections shall be made out of the presence of the jury."

11. It appears that Brown reiterated this request for an instruction on second-degree murder when the jury, after commencing its deliberations, asked the court to define first-degree murder.

was coupled with the requested instruction, which defined second-degree murder and the element of malice aforethought. By explicitly referring to the requested instruction, we believe Brown notified the trial justice with adequate specificity of the grounds for his objection, and thereby fulfilled the requirement and purpose of Rule 30.

Because we hold that this issue was not waived, we turn our attention to the merits of Brown's claim that he was entitled to a jury instruction on second-degree murder. It is well settled that on appeal this Court must review the record to determine if there is sufficient evidence to warrant a jury charge on second-degree murder. *State v. Ortiz,* 824 A.2d 473, 485 (R.I.2003). "A defendant is entitled to a jury instruction on a lesser-included offense only when the evidence justifies such an instruction and only when the evidence could support a conviction by a rational jury." *State v. Garcia,* 883 A.2d 1131, 1137 (R.I.2005). We conduct a *de novo* review to determine whether " 'an actual and adequate dispute exists as to the distinguishing element between the lesser and greater offenses in question' * * * [w]hen there is no such dispute, our review is at an end." *Id.*

The General Assembly has defined the crime of murder as the "unlawful killing of a human being with malice aforethought." G.L.1956 § 11–23–1. First-degree murder is characterized as any kind of willful, deliberate, malicious, or premeditated killing. *Id.; see also Garcia,* 883 A.2d at 1137. All other murder is second-degree murder. Section 11–23–1. We repeatedly have said that the "difference between first- and second-degree murder is the element of premeditation: first-degree murder 'requires proof of premeditation of more than a momentary duration and proof of deliberation whereas second-de-

gree murder does not.' " *State v. Sosa,* 839 A.2d 519, 527 (R.I.2003).

Brown contends that the jury in this case would not have been unreasonable to conclude that the killing of Pamela Plante was not willful and deliberate, but yet so wanton and reckless as to constitute murder in the second degree. *See State v. McGranahan,* 415 A.2d 1298, 1302 (R.I. 1980) ("Malice consists of an unjustified disregard for the possibility of death or great bodily harm and an extreme indifference to the sanctity of human life."). To support this claim, Brown relies on evidence presented by the medical examiner that neither the stab wound nor the ligature tied around Pam's neck would have killed her instantly. In addition, her legs were not bound and her mouth was not taped. Brown urges that based on this evidence, it would have been reasonable for the jury to conclude that, although he had acted wantonly and recklessly by seriously injuring and incapacitating Pam, he left her alive and possibly capable of summoning help, and therefore may not have intended to kill her.

The issue before us is whether an actual and adequate dispute exists as to the distinguishing element of premeditation between first-degree murder and the lesser-included offense of second-degree murder. *See Garcia,* 883 A.2d at 1137. It is our opinion that no such dispute exists. We have defined premeditation "as requiring the formation of an intent to kill for a period more than momentarily prior to the killing itself." *State v. Vorgvongsa,* 692 A.2d 1194, 1196 (R.I.1997). Based on the record before us, we believe it to be beyond question that Brown acted with premeditation and deliberation when he brutally murdered Pamela Plante, and it would have been unreasonable for a jury to conclude that he lacked the premedita-

tion necessary for a conviction of first-degree murder.

The evidence shows that Brown cut the leg of Pam's jeans from her body, sexually assaulted her, stabbed her in the neck several times, and used the telephone cord from Pam's apartment to both bind her arms behind her back and strangle her. Brown asserts that the fact that Pam died slowly negates the element of premeditation and tends to show that he acted only wantonly and recklessly. On the contrary, we believe that the manner of death is compelling evidence of Brown's premeditation. Even if Pam had miraculously been capable of crawling to the phone after being stabbed and bound, she would not have been able to call for help because Brown had disconnected the telephone cord and used it to bind and strangle her. In addition, although she possibly would have been able to speak because the stab wound did not damage her voice box, the knife did pierce her trachea, which would have caused her to cough and gasp. In this condition it would have been difficult for Pam to talk, let alone cry out for help.

As the state argues, it is also reasonable to infer from the crime scene evidence that Brown remained in the apartment for at least a brief period while his brutalized victim slowly and painfully perished. The evidence suggested that Pam was stabbed on the couch, that she subsequently fell to the floor, and that a place mat was draped over her body in the position in which she eventually was discovered. Also, a knife, the blade of which was consistent with the

types of wounds found on Pam's body, was found in the bathroom sink, and the contents of her pocketbook had been emptied out on the floor. The television and VCR that were in Pam's apartment on April 1, 1998, were removed. The evidence is compelling that Brown was there long enough to realize that Pam was severely injured and incapable of saving her own life. Accordingly, we assign no merit to Brown's claim that a reasonable jury could find that although he had acted wantonly and recklessly by seriously injuring and incapacitating Pam, he left her alive and possibly capable of summoning help, and therefore may not have intended to kill her.

Our case law dictates that a defendant in a murder trial is not entitled to a jury charge on second-degree murder unless during trial there was minimal evidence produced tending to show that the defendant did not act with premeditation. *Sosa,* 839 A.2d at 527. After thoroughly reviewing the record of this case, we are convinced that the evidence does not meet this minimal standard, and therefore Brown was not entitled to a jury instruction on second-degree murder.

## IV

### Life Sentence Without Parole

 At the conclusion of the trial, based upon the jury's finding of aggravating circumstances, the trial justice imposed a sentence of life without parole pursuant to G.L.1956 § 12–19.2–4.[12]

---

12. General Laws 1956 § 12–19.2–4 provides:

"At the presentence hearing, following a finding that one or more of the circumstances enumerated in § 11–23–2 or § 11–23–2.1 as the basis for imposition of a sentence of life imprisonment without parole was involved in the first degree murder of which the defendant has been convicted, the court shall consider evidence regarding the nature and circumstances of the offense and the personal history, character, record, and propensities of the defendant which are relevant to the sentencing determination. After hearing evidence and argument regarding the aggravating and mitigating circumstances relating to the offense and the defendant, the court shall, in its discretion, sentence the defendant to life imprisonment

When he sentenced defendant, the trial justice said that the pictures of Pam's mangled and bound body, which were taken at the crime scene and introduced into evidence at trial, were some of the most gruesome that he had ever seen. He further commented that such a crime as had been committed against Pam could have been accomplished only by a very vicious person who was so corrupted by evil as to be incapable of becoming a good and worthwhile citizen, and such a person should never be allowed to walk freely in our society.

The defendant now appeals that sentence to this Court in accordance with § 12–19.2–5,[13] and maintains that a life sentence without parole is inappropriate in this case. He contends that his life story reveals a young man concerned for others, and capable of great kindness, but who strayed from the path of righteous living due to his involvement with drugs. On the other hand, the state argues that defendant always has demonstrated a callous disregard for decent societal standards and that he committed a brutal murder, subjecting his victim to a slow and agonizing death.

■■■ This Court reviews a sentence of life without parole, pursuant to § 12–19.2–5. That statute calls for a review of the transcripts of the trial after which the Court "may, in its discretion, ratify the imposition of the sentence of life imprisonment without parole or may reduce the sentence to life imprisonment." In reviewing such a sentence, it is incumbent upon

this Court to exercise "independent judgment and discretion in deciding the appropriateness of the sentence." *State v. Pacheco,* 763 A.2d 971, 981 (R.I.2001). We have held that such a review shall be comprehensive, and in conducting it, we "examine the total record, consider the findings of the trial justice and review the personal character, record, and propensities of the defendant." *Id.* (citing *State v. Tassone,* 749 A.2d 1112, 1119 (R.I.2000)).

We are mindful that this most extreme sentence should be reserved for a narrow class of the most heinous crimes. As we subject this record to our independent review, we have considered both the horrific circumstances of the actions perpetrated by this defendant, and just as importantly, his prospects for rehabilitation and return to society as a productive member.

It is strikingly clear that the victim of this defendant's barbarism endured a death that was the product of unspeakable depravity and violence, and that she died a slow, terrifying, and agonizing death. When she described the victim's wounds, the state medical examiner testified that Pam was strangled with a telephone cord while alive and also stabbed with a knife in the face and neck. Her hands, covered with defensive cuts, blood, and strands of her own hair, evidenced that she had attempted to resist Brown's vicious attack, and to remove the ligature from her neck, but to no avail. The medical examiner further testified that Pam was tied up in such a way that with each attempt to free her hands, or if she simply let them fall to

without parole or to life imprisonment. The court shall state on the record its reasons for imposing its sentence."

**13.** Section 12–19.2–5 provides:

"The defendant shall have the right to appeal a sentence of life imprisonment without parole to the supreme court of the

state in accordance with the applicable rules of court. In considering an appeal of such a sentence, the court, after review of the transcript of the proceedings below, may, in its discretion, ratify the imposition of the sentence of life imprisonment without parole or may reduce the sentence to life imprisonment."

her side, she caused the cords to cinch more tightly around her neck, slowly cutting off the flow of blood to her brain. We completely agree with the finding of the jury that the aggravating factors set forth in § 11–23–2 are present in the case before us.

Turning to the prospects for rehabilitation, we have examined the sentencing memoranda of both the defendant and the state, the presentence report of the probation officer, and the transcript of the sentencing hearing. This defendant portrays himself as a product of a normal, loving, and close-knit family who turned to crime only because of an addiction to crack cocaine. He denies any violent history with respect to his self-described minor criminal record.

However, our perusal of that same record convinces us of something entirely different. The defendant's criminal record reveals no fewer than ten convictions in Rhode Island since 1995, as well as several other contacts with law enforcement agencies in nearby Massachusetts. His transgressions run the gamut from driving violations to drug offenses to assaultive behavior.

We are also impacted by the defendant's total lack of remorse with regard to the violent sexual attack and murder of Pamela Plante. The presentence report from the Department of Corrections, Adult Probation and Parole, contains a statement that defendant made to the probation officer in which Brown is quoted as saying that he got "a raw deal at the trial" and further that "I wish whoever did it would come forward so I could go home. I feel bad someone took her life from her in that horrible way. Anyone I've been with can tell you I would never hit a woman." We have said that a defendant's remorse is an appropriate consideration in the imposition of a criminal penalty. *State v. Tiernan,* 645 A.2d 482, 485 (R.I.1994).

When he faces the sentencing judge a defendant must make an election as to whether he will express remorse in open court. In this case, not only did Brown demonstrate a total lack of remorse, but he continued to refuse to take responsibility for his grotesque actions and attempted to pass them off on someone else. This, in our opinion, does not enhance his prospect of rehabilitation.

Our independent review of this case leads us to the firm and inescapable conclusion that the trial justice was justified in imposing the harshest possible sentence on this defendant, and we expressly ratify that sentence.

### Conclusion

For these reasons we deny the defendant's appeal and remand the papers in this case to the Superior Court.